### SIGUA IRON CO. v. GREENE.

#### (Circuit Court of Appeals, Second Circuit. June 13, 1898.)

1. TRIAL — MOTION FOR DIRECTION OF VERDICT — WAIVER OF RIGHT TO GO TO JURY.

    A party, by moving for the direction of a verdict, does not thereby waive any right he may have to go to the jury on questions of fact, and where both parties at the close of the evidence moved for the direction of a verdict, and both motions were denied, but the court, over the exception of one party, submitted a single issue of fact to the jury, such party is not estopped by his motion from assigning as error the failure of the court to submit the case generally.

2. SAME—DIRECTION OF VERDICT—QUESTIONS FOR JURY.

    The testimony of a party on a material issue, though uncontradicted, should be submitted to the jury if his adversary so requests.

3. CORPORATIONS—STOCKHOLDERS—CREATION OF RELATIONSHIP.

    The relation between a corporation and a stockholder is a contractual one, and, although an express contract between them is not necessary to its creation, there must be an assent by both parties, either express or implied.

4. SAME—SUIT AGAINST STOCKHOLDER—PROOF OF RELATIONSHIP.

    In an action by a corporation to recover an assessment, entries of defendant's name in plaintiff's books as a stockholder are not prima facie evidence that he is such stockholder.

5. SAME—ACQUIESCENCE IN ALLOTMENT OF STOCK.

    A person who approves, ratifies, or acquiesces in the transfer to him of shares of stock in a corporation is liable as a stockholder, though the transfer was originally made without his knowledge or consent.

6. SAME—TRIAL—WITHDRAWAL OF QUESTION FROM JURY.

    In an action to recover from defendant assessments on certain shares of stock which had stood in his name for some years on the books of the corporation, where it was a material question whether defendant knew such fact, and acquiesced in it, and he testified that he did not, but it was shown that during a portion of the time defendant, who owned other stock, was a director of the corporation, the plaintiff was entitled to have such question submitted to the jury.

7. EVIDENCE—CONTRADICTING WRITTEN CONTRACT—WHEN RULE APPLIES.

    The rule that parol evidence cannot be received to contradict or vary a written contract does not apply as against either party in an action be-

tween a party to the contract and a third person, as the estoppel on which the rule rests must be mutual, and the third person is not bound by the contract.

This cause comes here on a writ of error brought by plaintiff below to review a judgment of the circuit court, Southern district of New York, in favor of defendant below, said judgment being entered upon a verdict directed by the court.

The action was brought by plaintiff, a West Virginia corporation, to recover a balance unpaid on some stock in said company, which it claimed to have been owned by defendant. The following outline of the facts and history of the case sufficiently indicates the points discussed in the opinion, infra: In the early part of the year 1890 a number of persons known as the "Sigua Syndicate" had obtained and held an option on certain mining property,—the legal title seems to have been in one E. D. Smith, as trustee,—and for the purpose of taking over and operating such property the plaintiff corporation was formed in April, 1890. Its authorized capital stock was $5,000,000. Of this $1,000,000 was treasury stock. $1,000,000 was issued full paid, and $3,000,000 was issued 65 per cent. paid. By an agreement known as the "Sigua Syndicate Agreement" all of the stock of this company was underwritten. The several signers agreed to transfer the option and leasehold to the company for said $5,000,000 capital stock, to return $1,000,000 of the full-paid stock to the company to be held as treasury stock for company purposes, and to take the number of shares set opposite their names, both of full paid and of 65 per cent. stock. All rights to any stock secured to the subscribers under this agreement were divided into 30 equal (syndicate) shares, and defendant subscribed, through E. D. Smith, his agent, duly authorized to make such subscription, for one-half share. In due course the shares of stock coming to defendant under this agreement were issued to him. All assessments thereon have been duly paid in money or services, and no claim by reason of his holding such shares has been made against him. Some of the subscribers to the Sigua Syndicate agreement, being of the opinion that they were taking more of the stock than they cared to hold, formed a pool to dispose of such surplus of 65 per cent. paid stock. Of course, no one wished to part with the full-paid stock. The object was presumably to get rid of possible liability for future calls. E. D. Smith was one of this pool. He contributed 1,250 shares, the whole number of shares in the pool being 10,000, which was one-third of the total number of 65 per cent. paid shares to be issued by the company. These 10,000 shares were put in Smith's hands by the members of the pool, to be disposed of. It turned out that considerably less than half of this pool of 10,000 shares was thus disposed of. The balance, of course, remained the property of the original subscribers, and was subsequently placed, or ought to have been placed, in their names on the books of the company. The fundamental question in dispute here is whether 400 of these 10,000 shares was disposed of to the defendant, or whether its original holder is still the owner, and liable for any unpaid balances thereon. The agreement by virtue of which it is contended that defendant engaged to take said 400 shares, and touching them, to become a stockholder in the company, is as follows:

"Agreement of purchase of Sigua Iron Company Stock. Capital stock, $5,000,-000. Par value, $100 per share. $1,000,000 of capital stock to be left in the treasury of the company.

"We, the undersigned, hereby agree with the Sigua Syndicate to purchase from them, at $35 per. share, the number of shares (of the par value of $100 each), set opposite our names, respectively, the same being 65 per cent. paid, and liable to further calls and assessments to the extent of 35 per cent., said 35 per cent. being payable $1/10$, or 10 per cent., thereof, on call, and the remainder as required, probably at the rate of $1/10$, or 10 per cent. of said 35 per cent., every two months, or a proportionate part in case of over-subscription:

| "Name. | Address. | Number of Shares. | Amount to be Paid. |
|---|---|---|---|
| B. D. Greene. | 50 Broadway. | 1,000 | 35,000 |
| I. L. Pierson. | Care Adolph Boissevain & Co., Amsterdam. | 500 | 17,500 |
| Robert Fleming, Per E. D. S. | Care Maitland, Phelps & Co., New York. | 500 | 17,500 |
| W. M. Chauvenet. | St. Louis, 709 Pine St. | 100 | 3,500 |
| Samuel Bell, Jr. | 208 So. 4th St. | 100 | 3,500 |
| H. M. Sill. | Schwl Lave, Gtn. | 100 | 3,500 |
| W. W. McKee. | Catasauqua. | 200 | 7,000 |
| J. W. Fuller. | " | | |
| Chas. H. Audon. | | 100 | 3,500 |
| A. P. Berlin, Per E. D. S. | Slatington, Pa. | 100 | 3,500 |
| F. F. Vandervoort. | Phg., Pa. | 100 | 3,500 |
| M. E. Olmstead, Per E. D. S. | Harrisburg. | 200 | 7,000 |
| Paul Thompson. | 206 So. 4th St. | 50 | 1,750 |
| E. J. Collins. | Bullitt Building. | 100 | 3,500" |

The Sigua Syndicate did not sign this agreement, nor, so far as appears, was it or any agreement to sell ever signed by any of the members of such subsyndicate or pool. All of these transactions occurred before any certificate of stock had been made out by the company. On July 8, 1890, three certificates were made out to E. D. Smith, trustee,—two each for 10,000 shares full paid, and one for 29,995 shares 65 per cent. paid, and were issued to him on that day. Thereupon, and on the same day, he delivered back two of these (one of the 10,000 share certificates and the 29,995 share certificate), indorsed with a statement to whom the shares should be transferred. Transfers were thereupon made upon the books of the company, and stock certificates prepared in conformity to such list. Two certificates were made out in the name of defendant, covering his half share under the original syndicate agreement, and, in addition, one for 600 and one for 400 shares.

It will be observed that defendant's name is subscribed to the agreement of purchase for 1,000 shares. He accepted 600 of these, took stock certificate therefor, and, so far as appears, has responded to any calls thereon. It is as to the balance only—400 shares—that dispute has arisen. The defendant admits his signature to this document; his contention, briefly stated, being that he signed upon an express understanding with the representative of the sellers that he was to take only such part of the 1,000 shares as he could find outside purchasers for; that he notified Smith, the representative of the seller, and also notified the president of the company, that he had been able to place only 600 shares, and would take only that quantity, and that his contention as to the number of shares of stock which should be thus allotted to him was, so far as he knew, always acquiesced in by the company. He insists that he did not know these 400 shares had ever been transferred to him on the books, and that he never authorized or acquiesced in such transfer.

Upon the first trial of the action the case went to the jury, and plaintiff recovered verdict for the full amount. Upon appeal to this court judgment was reversed. The opinion is reported, but not in full, as Greene v. Iron Co., in 22 C. C. A. 636, 76 Fed. 947.[1] Upon the new trial two specific questions were put to the jury and upon their answers being received verdict was directed for defendant.

Howard A. Taylor, for plaintiff in error.

L. Laflin Kellogg, for defendant in error.

Before LACOMBE and SHIPMAN, Circuit Judges.

[1] See, for a full report of this case, 88 Fed. 203.

88 F.—14

LACOMBE, Circuit Judge (after stating the facts). Before discussing the merits of this appeal, it will be well to dispose of a point of practice which was presented upon the argument. Plaintiff in error insists not only that upon the whole case it was entitled to a direction, but also that, if that be not so, there were disputed questions of fact which the court improperly took from the jury, and itself decided. Defendant in error insists that plaintiff in error is in no position to raise this objection. The point is thus stated in defendant's brief:

"Where, at the close of the evidence on a trial, both parties ask the court to direct a verdict in their favor, and the court directs a verdict for one side, to which the other excepts, but makes no request to go to the jury, it will be held that the parties have thus treated the case as presenting questions of law only, and, there being evidence to support the ruling, the judgment should not be assailed by showing that there were questions of fact arising on the evidence."

In support of this proposition are cited Provost v. McEncroe, 102 N. Y. 650, 5 N. E. 795; Sutter v. Vanderveer, 122 N. Y. 652, 25 N. E. 907; Daly v. Wise, 132 N. Y. 306, 30 N. E. 837; Board v. Beal, 113 U. S. 227, 5 Sup. Ct. 433; Robertson v. Edelhoff, 132 U. S. 614, 10 Sup. Ct. 186. The circumstance that a party, at the close of the case, moves the court to direct a verdict in his favor, does not, of course, operate to waive any right he may have to go to the jury. Such motion may be made, and most often is made, upon the theory that some controlling proposition of law would require a decision in the party's favor, although some or all of the disputed questions of fact were decided in his adversary's favor. But, if the court be not convinced as to the soundness of his proposition of law, he is none the less entitled to have his hearing before the triers of the facts upon any disputed material issues of fact in the case, unless in some way or other he waives his right, or leads the court to suppose that he concedes there is no material fact in dispute. In the suppositions case stated above, where both sides move for a direction, and one motion is granted and the other denied, and the defeated party takes an exception only, without any suggestion that there is some material fact in dispute that should go to the jury, the court is entitled to assume that he concedes there is nothing material for the jury to pass upon. But the case at bar is a very different one from that to which the authorities are cited. The proofs being closed, both sides moved for the direction of a verdict, but the court denied both motions. Two dispositions of the case, and two only, were then possible: A juror might have been drawn, or the case given to the jury. When cases are given to juries, it is the usual practice to require them to give a general verdict upon all the evidence. Until they were in some way notified that a special verdict would be required, both sides, their motions being denied, were entitled to assume that the verdict was to be a general one on the whole case. Thereupon the court announced that it was going to leave one question only to the jury, namely, "to find whether there was an agreement between the defendant and Smith, as trustee for the syndicate, by which Greene was to become an out and out purchaser of 1,000 shares, or

whether it was, in substance, as the defendant claims, that he was only to take such shares as he could dispose of." "Then," added the court, "when that finding is in the case, I will direct a verdict either one way or the other." To this plaintiff duly excepted. When the court announced its decision to send only one question to the jury, it necessarily announced its decision to withdraw all other disputed material questions of fact from the consideration of the jury, and under the exception to such a disposition of the case plaintiff in error would be entitled to contend, as to any material question of fact, that it was improperly withdrawn from the jury. We find no force, therefore, in this preliminary objection.

Upon the first trial, the court left it to the jury to say upon all the evidence in the case whether defendant ever became a stockholder of plaintiff, directing their attention particularly to later transactions between defendant and the officers of the company subsequent to July 1, 1890. As to the agreement of purchase,—the second agreement, supra,—however, it gave the jury distinctly to understand that under its terms Greene succeeded to the rights and obligations of those from whom the 1,000 shares were to come, and that to relieve himself therefrom he would have to show in some way that he had been released and discharged. The jury were told that among the "undisputed facts in the case" were "Greene's purchase of one thousand shares," and "his liability to pay therefor unless he was somehow released." This court, upon appeal, reached a different conclusion as to this second agreement. We held that when it was signed "the syndicate did not have legal title to the shares, because they had not at the time been transferred to the syndicate upon the books of the company." We might have added—certainly upon the evidence now before us it stands uncontradicted—that the opening declaration of the agreement is a misstatement. "The undersigned" did not by that paper, nor by any other paper, nor orally, nor in any way, "agree with the Sigua Syndicate to purchase from them" the shares referred to. It is true that E. D. Smith, who was the trustee of the Sigua Syndicate, solicited subscriptions to the paper; but he himself says—and he was plaintiff's witness—that the shares he was trying to dispose of were the shares, not of the syndicate, but of individual members, who had formed a pool to get rid of their stock. Why the paper was so phrased as to delude the unwary subscriber into the belief that he was dealing with the Sigua Syndicate, and not with the individuals who were seeking to unload before a call, does not appear, but may be surmised. This court further held that it was merely an executory engagement for the purchase of shares, which, if it had been valid, would have rendered defendant liable in damages upon his failure to perform; but not a present contract of purchase. Moreover, we held that it was not a valid contract for want of consideration; that, if the syndicate had refused to transfer the shares to defendant, and he had sought redress for his damages, it would have been a complete answer to his action that there was no promise on the part of the syndicate to transfer to him any shares. A like answer might have been made even by the individual members of the pool; while, as appears by the record now before

the court, the Sigua Syndicate might truthfully defend upon the sufficient ground that it never had anything to do with the record agreement in any way, shape, or manner, its name being used merely as a figurehead by a man who showed no authority to act. Finally, we suggested that the agreement might perhaps be construed as a "unilateral contract * * *, in effect a request or proposal to the promisee, in which it is not necessary that the consideration should exist at the time of making the promise, and when, if the promisee acts upon the promise, it becomes obligatory; but in this class of contracts the promisor may always retract before performance by the promisee, and in the intermediate time the promise is inert." Whether the agreement in this case was to be thus construed we did not consider, "inasmuch as the defendant retracted his promise before the shares were transferred to him." For these reasons we reversed the former judgment, stating that it was error for the trial judge not to direct a verdict for the defendant. The views heretofore expressed in this court as to the nature and effect of the agreement called for reversal, but we were probably in error in holding that the trial judge should have directed a verdict for defendant. The evidence that "defendant retracted his promise before the shares were transferred to him" was that of Greene himself, and the testimony of a party on a material issue should always be submitted to the jury, even though uncontradicted, if his adversary so request.

In some important respects the case made upon the second trial is different from that under the evidence as admitted upon the first trial, and examined on the first appeal. Plaintiff's own evidence shows that the written document, known as the "agreement of purchase," and whose construction occupied the attention of the court on the former appeal, incorrectly expresses the result of the negotiations which it undertakes to record; that the Sigua Syndicate was not a party to such agreement, nor to any of the negotiations that led up to it; that it never agreed to sell its shares to the subscribers to such agreement, and never agreed with them that they should purchase, but that under the guise of the Sigua Syndicate a few of its members did undertake to relieve themselves from liability by selling some of their shares; and that signatures to such agreement were obtained to accomplish this object. Defendant put in stronger evidence, which induced the jury to answer the questions put to them, supra, the first in the negative, the second in the affirmative. The questions, therefore, presented on this writ of error differ materially from those considered when the first trial was under review. Before discussing them, it may be well to restate the fundamental proposition set forth in our former opinion that "a person cannot be constituted a shareholder in a corporation by a transfer of shares without his consent." The same proposition was enunciated by this court in Carey v. Williams, 25 C. C. A. 227, 79 Fed. 906, in these terms: "The relation of corporation and stockholder is a contractual one, and can only be created with the consent, express or implied, of both parties." This statement by no means necessarily implies that the relationship can be created only by express contract between the corporation and the stockholder. Plaintiff in error is quite correct in the suggestion

that this occurs but rarely; substantially the only instance being in the case of an issue of treasury stock. In the case of a transfer of stock there is either a contract between transferror and transferee, whereby the latter acquires the rights of the former, or there is a gift, defined by some authorities as an executed contract, which is founded on mutual consent, for the minds of the parties must meet alike in the case of a gift and of a contract founded on consideration. When the purchaser, donee, or transferee has thus, by his own act, succeeded to the rights of the former holder of the shares, he has voluntarily assumed a relationship to the corporation which makes it the duty of the corporation to accept him as a stockholder, and to perfect his title by a transfer on the books, and makes it his duty to accept such transfer on the books and become a stockholder of record whenever the corporation or the former holder so requires. It seems hardly necessary to discuss whether this shall be defined as an implied contract or a quasi contract. The important fact is that assent by the newcomer is an essential prerequisite. We do not understand that there is any contention here that a man may be made a stockholder by the mere unauthorized entry of his name upon the books without his knowledge or consent, or that he may, without such knowledge or consent, be made a stockholder, even by act of the legislature. It is contended, however, that when a person's name appears on the books as a stockholder, no matter how it got there, such entry is prima facie proof that he is a stockholder, and the burden is on him to disprove it. This proposition was discussed and decided contrary to the contention of the plaintiff in error by this court in Carey v. Williams, 25 C. C. A. 227, 79 Fed. 906. The correctness of such ruling is, of course, questioned in the case at bar, and it is suggested in the brief that "the courts of the different states in this country are handing down decisions every few months directly to the contrary of Carey v. Williams." We find, however, on referring to the three authorities cited to this proposition, that in none of them is Carey v. Williams referred to, and that two of them were decided before the opinion in that case was itself handed down. Whatever may be held elsewhere, this court abides by its decision in Carey v. Williams, being unwilling to substitute a rule as to the probative force of such entries in the books, which, in some of the cases approving it, is called "a rule of convenience," when we are entirely satisfied that it would in many cases prove to be a "rule of injustice,"—unless constrained to do so by controlling authority. In Carey v. Williams it was fully explained why this court did not find such controlling authority in Turnbull v. Payson, 95 U. S. 418. Plaintiff in error refers to a later decision of the supreme court,—Finn v. Brown, 142 U. S. 56, 12 Sup. Ct. 136. In that case the language of Mr. Justice Clifford in Turnbull v. Payson is cited with approval, but no such proposition was necessary to the decision. A verdict had been directed against defendant as a stockholder. He contended that he had a right to go to the jury upon his own evidence that he knew nothing of the transfer to himself, and had not authorized it. The uncontroverted facts showed that 50 shares in a national bank were transferred to his name on October 29th, and a certificate made

out. He had not theretofore owned any stock in the bank. On October 30th he was appointed a director and vice president. Section 5146, Rev. St. U. S., provides that every director must own in his own right, during his whole term of service, at least 10 shares of stock; and that, if he does not own such 10 shares, he cannot become or continue a director. Section 5147 requires each director, when appointed or elected, to take an oath declaring, inter alia, that he is the owner in good faith and in his own right of the requisite number of shares. In the absence of proof to the contrary, the supreme court held that it must be presumed defendant took such oath before he acted as director. On November 21st, at a directors' meeting at which defendant was present and voting, the resignation of the cashier was accepted, and defendant, as vice president, was authorized to act as cashier until a new cashier should be regularly appointed. Thereafter, and until the bank's failure in January ensuing, he acted under such authorization as cashier. Section 5210 provides that "the president and cashier of every national banking association shall cause to be kept at all times a full and correct list of the names and residences of all the shareholders  *  *  * and the number of shares held by each." In view of these facts, it is not surprising that the supreme court held that defendant "must be presumed conclusively" to have had knowledge of what the books showed as to his holding of stock, and to have assented thereto.

The next question for consideration is whether, as the case is presented here, taking the contract between Smith and Greene as the jury found it, there was any authority for the transfer of the 400 shares to him on the books of the company. The entries in the books were made under Smith's direction. To what extent was that direction authorized? As to 166⅔ shares of full paid and 500 shares of 65 per cent. paid stock (being a one-half share in the syndicate), he had Greene's express written agreement to accept the same from the Sigua Iron Company. As to the 1,000 shares, he had the express written agreement of one or more of the other members of the Sigua Syndicate to accept the same from the Sigua Iron Company, and, in the absence of anything more, he should have directed transfer to them. As to a part of those 1,000 shares, however, he had, as agent for the persons who had originally agreed to take them, effected a sale to Greene, and such of them as were so sold he might properly have transferred to Greene's name, because by buying them Greene assented to such transfer. But as to any shares not so sold, Smith had no authority to make such transfer, and the only shares included in the sale were those which Greene might be able to dispose of to others. The evidence warrants the finding that 600 shares were thus disposed of, but upon the theory of defendant in regard to the second contract, which the jury found to be correct, we do not find in the record, as to the 400 shares, any contract of the defendant whereby he assented to their transfer to him, or any authorization by him to Smith of a transfer to him. We must conclude, therefore, that the mere entry of his name in the books and on the certificate for these 400 shares did not make him a shareholder as to them. It does not follow, however, as matter of law, that he was not a

shareholder when this action was commenced. Although the mere transfer of stock on the books of the corporation to the name of an individual without his knowledge or consent imposes no liability, nevertheless, "if, after the transfer, he in any way approved, ratified, or acquiesced in such transfer," he will be held "liable to be treated as a shareholder." Keyser v. Hitz, 133 U. S. 149, 10 Sup. Ct. 290. Whether Greene knew that these 400 shares had been transferred to him, and stood in his name on the books, and whether, knowing that to be so, he took any steps to have them retransferred to the persons to whom, under the original syndicate agreement, they properly belonged, or "approved," "ratified," or "acquiesced in" the transfer to himself, were all questions of fact, and, if there was conflicting evidence thereon, it was for the jury to determine them. On the one side, defendant testified that he never saw the certificate for the 400 shares, or knew about its being in his name on the books. It appeared otherwise than by his testimony that on July 8th he wrote to the treasurer, inclosing check for an assessment on 600 shares (additional to his original 666), and stating that the other 400 shares subscribed by him had been taken by friends whom he might not see before going away (he left for Europe in July, and returned in August), but that as soon as he returned he would see them, and send in their names; that upon his return he informed the president of the company that these friends would not take the 400 shares, and that he could not place it; that thereafter he was never called on for any assessment (and there were several of them) on these 400 shares; that in subsequent treasurer's reports and at directors' meetings they were listed as "unplaced stock"; and that, when a request for payment was ordered by the directors to be made on "delinquent subscribers," his name was not included on the list, and no such request was made as to these 400 shares. On the other hand, it appears that from the date of organization (May 20, 1890) until April 11, 1892, he was himself a director. We do not hold that, as matter of law, it is therefore to be conclusively presumed that he knew his name stood in the stock certificate book as the holder of the 400 shares named in the unissued certificate. The case at bar differs materially from Finn v. Brown, supra. But it certainly was a circumstance proper to be considered by the jury when weighing his own testimony as to his ignorance of the fact. It also appeared that at the very directors' meeting at which the 400 shares were reported as part of the 2,120 "unplaced stock" it was identified as "B. D. Greene, 400 shares." Without expressing any opinion as to the weight of the evidence pro and con touching knowledge and acquiescence, we are satisfied that there was sufficient conflict upon the question to call for its submission to the jury; and in withdrawing it from their consideration, by submitting to them the single question as to the making of the contract over plaintiff's exception, we are of the opinion that there was error requiring a reversal and a new trial. A similar question was submitted to the jury on the first trial, but under instructions that the evidence showed that defendant had actually purchased the 400 shares, and was to be held liable thereon unless he showed that he had been

released. Why this was error has been already pointed out. On the facts as they stand on this record, with the answer of the jury to the questions put to them, the burden would not be upon defendant to show that he had been released, but on plaintiff to show that defendant knew he was entered as a shareholder, and acquiesced therein by permitting the entry to stand with no effort to alter it.

Plaintiff in error insists that there is no distinction between the case at bar and Hawkins v. Glenn, 131 U. S. 319, 9 Sup. Ct. 739, where a verdict was directed in favor of the trustee of the corporation against the stockholder. In the case at bar, however, there is no pretense that defendant was an original subscriber as to the shares in controversy. He obtained them, if at all, from a prior owner; and only to the extent to which he contracted to take such shares did he give his assignor authority to have them transferred to him. In Hawkins v. Glenn, however, the defendant contracted directly with the company. He was an original subscriber in his own name for 250 shares. It was undisputed that he knew the shares stood in his name, for the certificates, made out in his name only, were sent to and received by him, and never returned.

It is desirable that the other assignments of error which have been argued here should be disposed of, so as to eliminate as many questions as possible from the next trial of the action. It is contended that there was error in admitting evidence to vary the terms of the written instrument referred to above as the "agreement of purchase." Some question is raised as to whether plaintiff's counsel had not waived the right to object by himself introducing evidence thereon. It is not by any means clear on the record that he did so. The evidence he produced was put in at the close of the examination of a witness who was about to leave town, and counsel expressly stated that it was out of order, and in rebuttal, should defendant himself give evidence tending to vary the terms of the written instrument. Moreover, the evidence thus offered by plaintiff did not tend to vary the terms of the written instrument, but the reverse. However, it is not necessary to pass upon this point. Assuming, for the sake of the argument, that the plaintiff's exception was timely, and that it had not been waived by his previous conduct of the case, it was, in our opinion, unsound. The true rule is aptly expressed by the court of appeals of this state in Lee v. Adsit, 37 N. Y. 78, as follows:

"The rule that parol extrinsic evidence shall not be received to contradict or vary a contract which is in writing applies only in controversies between the parties, promisor and promisee in such contract. * * * The writing is not conclusive as between one of the contracting parties and a third person. This doctrine is asserted in a multitude of authorities, but in many instances it is accompanied by remarks from which it might be contended that the privilege of explaining the written document was not accorded to him, who was a party to it, but only to his adversary. 1 Greenl. Ev. § 279; New Berlin v. Norwich, 10 Johns. 230; Evans v. Wells, 22 Wend. 345. But it is not so confined. According to Co. Litt. 352a, 'every estoppel ought to be reciprocal that is to bind both parties, and this is the reason that regularly a stranger shall neither take advantage of or be bound by an estoppel.' To this effect, see Jewell v. Harrington, 19 Wend. 472; Sparrow v. Kingman, 1 N. Y. 246. * * * In Reynolds v. Magness, 24 N. C. 30, after stating the general rule, and that it applies only as between the parties, and not to strangers, Judge

Gaston says: 'They [the strangers] are at liberty to show that the written instrument does not disclose the full or true character of the transaction. And, if they be thus at liberty, when contending with a party to the transaction, he must be equally free when contending with them. Both must be bound by this [conventional law] or neither.' "

And the same court has since reiterated the same rule.

"Third persons are not precluded from proving the truth, however contradictory to the written statements of others. Strangers to the instrument, not having come into this agreement, are not bound by it, and may show that it does not disclose the very truth of the matter. And as, in a contention between a party to an instrument and a stranger to it, the stranger may give testimony by parol differing from the contents of the instrument, so the party to it is not to be at a disadvantage with his opponent, and he, too, in such case, may give the same kind of testimony." McMaster v. Insurance Co., 55 N. Y. 222. And to the same effect, Dempsey v. Kipp, 61 N. Y. 462; Lowell Mfg. Co. v. Safeguard Fire Ins. Co., 88 N. Y. 591.

Exception was reserved as to evidence tending to show notification to the company subsequent to July 9th that defendant had not placed the shares, and would not take them. If the case stood as it did on the first trial, the agreement, being an executory one,—an offer to purchase 1,000 shares,—which would have become binding upon the promisor if the promisee acted before the offer was retracted, this date would be of much importance, since it was on July 9th that the promisee transferred the stock. Subsequent retraction by the defendant would have availed nothing, and evidence thereof would have been immaterial and irrelevant. But in the shape the case took upon the second trial the evidence was admissible upon the question whether or not defendant knew that he was entered on the books as a stockholder, and acquiesced in such entry. And on the same theory the reports of the treasurer and the minutes of directors' meetings were competent evidence. The judgment of the circuit court is reversed, and cause remanded for a new trial.