## Appeal of J. W. SOLOF.    Docket No. 482.

From the evidence submitted, *held*, that stock received as part consideration upon a sale of real estate had a readily realizable market value in excess of the amount determined by the Commissioner.

A sum charged by a bank for making a loan which was included in a promissory note for the amount borrowed, and which was not paid within the year, was not a proper deduction from gross income, since the taxpayer kept his books and rendered his return on a cash receipts and disbursements basis.

Taxpayer made application to a banking institution of Charleston, W. Va., to finance him in the construction of a building on land which he owned. The bank, in order to avoid State, county, and city taxes, agreed to advance the amount of money desired for the construction of such building, and for other purposes, provided he would form a corporation and have the preferred stock issued to himself; transfer the same to the bank and personally guarantee payment of the principal, together with the dividends on the stock, according to its tenor, by pledging to the bank certain real and personal property of a value in excess of the par value of the stock. The amount received by taxpayer was $7,500 less than the par value of the stock transferred, that sum being the amount of the commission charged by the bank for handling the transaction. *Held*, that the transaction while in form a sale was in reality a loan to taxpayer, and the amount received did not constitute income. The $7,500 commission was not a legal deduction from income in 1921 since that sum was not paid within the year.

Submitted January 16, 1925; decided March 16, 1925.

*D. C. Howard, Esq.*, for the taxpayer.

*A. Calder Mackay, Esq.*, for the Commissioner.

Before GRAUPNER, LANSDON, LITTLETON, and SMITH.

This is an appeal from an alleged deficiency of $88,005.47 for the calendar year 1921 after allowing an overassessment of $99.81 for the year 1919, as set forth in the deficiency letter mailed to the taxpayer on September 18, 1924. From oral and documentary evidence, and certain stipulations by counsel, the Board makes the following

### FINDINGS OF FACT.

(1) The taxpayer is a resident of Charleston, W. Va., and during the year 1921 was engaged in the retail clothing business.

(2) The taxpayer kept his books and rendered his return on a cash receipts and disbursements basis.

(3) On February 25, 1921, he sold a certain lot on Summers Street, Charleston, W. Va., to Henry Fry et al., for which the consideration was as follows:

| | |
|---|---:|
| 3 promissory notes, totaling | $21,500 |
| Assumption by purchaser of outstanding notes against property | 20,000 |
| 225 shares, par value $100 each, of the capital stock of the Kanawha Land Co | 22,500 |
| Total | 64,000 |

For the purpose of computing a profit on this sale, taxpayer, in his return for the calendar year 1921, reported the consideration received for this property as $57,000, including therein the 225 shares of stock at a value of $15,500, or $68.89 per share. The books of the Kanawha Land Co. show that during the year 1921 there were two cash sales of 10 shares and 200 shares of stock, respectively, at $75 per share, also two transfers of 200 and 555 shares, respectively, in trade. Dividends were paid on this stock during 1921. The stock of this company was closely held by a group of wealthy business men of Charleston, W. Va. The revenue agent during his investigation, and at the suggestion of taxpayer's counsel, interviewed Mr. Staunton, a banker of Charleston and the principal stockholder of the Kanawha Land Co., as to the fair market value of this stock. Mr. Staunton furnished the revenue agent with a written statement that he considered the stock worth between $75 and $80 per share and that he considered his stock in this company worth par. The Commissioner, in computing profit on this sale, accepted the total consideration of $57,000 reported by the taxpayer in his return, but now insists that the profit should be computed upon a consideration of $58,500, his reason being that the evidence shows that the 225 shares of stock of the Kanawha Land Co. had a fair market value of $17,000, or $75.55 per share.

(4) During the year 1921 the taxpayer borrowed from the Kanawha Banking & Trust Co., of Charleston, the sum of $90,000. At the time of making the loan the bank received taxpayer's promissory note in the amount of $100,000, bearing interest at the rate of 6 per cent per annum, $10,000 being charged by the bank as a bonus for the loan. No payments were made on this note during the year 1921.

(5) The taxpayer was the owner of a building lot in Charleston on which he desired to erect an office building. He applied to the Central Trust Co. of Charleston for a loan to finance the construction of such a building and, also, to supply him with additional money for personal use. The Central Trust Co. would not make taxpayer a loan directly, due to the high rate of State, county, and city taxes, but advised the taxpayer that it would furnish him the amount of money desired if he would organize a corporation, have the common and the preferred stock issued to himself and transfer the preferred stock to the bank and obligate himself to retire the stock at par and to pay the dividends thereon. Taxpayer thereupon incorporated the Charleston Office Building Co., having the corporation issue to him $175,000 of 7 per cent cumulative preferred stock, par value $100 per share. Series "A" to "J" of this preferred stock was for $125,000 and series "K" to "T" was for $50,000. For this preferred stock the taxpayer leased to the corporation the building lot for a period of 11 years, agreeing, with the corporation, to erect thereon a five-story brick and concrete building at a cost of $80,000. The only asset which the Charleston Office Building Co. had during 1921 was the 11-year lease on the lot carrying with it the right during the term thereof to receive future rentals from the building which the taxpayer agreed to construct. This $175,000 of the preferred stock was transferred by taxpayer to the Central Trust Co. for $167,500; $7,500 (75 shares) represented the charge by the bank for financing the transaction. At the time of the transfer of the preferred stock to the Central Trust Co., the taxpayer entered into a written agreement with the bank to repurchase or retire the stock and to pay the dividends thereon. To guarantee payment of the principal and the dividends on this stock he mortgaged and pledged to the bank certain real and personal property of the approximate value of $300,000. The values placed by the Central Trust Co. upon the property mortgaged and pledged are as follows:

| Property | Value |
|---|---|
| 1. Quarrier Street lot, purchase price, 1921 | $51,000 |
| 2. Bradford Building, purchased 1917 for $100,000 | 125,000 |
| 3. 850 shares common stock of Solof Co., par value $100; market value $125 | 106,250 |
| 4. 225 shares common stock Kanawha Land Co., par value $100. | |
| 5. 40 shares preferred stock Ohio Valley Electric Railway Co., par value $100; market value $110 | 4,400 |
| Total property mortgaged | 286,650 |

Pursuant to the understanding between the taxpayer and the Central Trust Co. as to the form and manner in which the money should be advanced by the Central Trust Co., the transaction was carried out by a series of written agreements entered into between the Central Trust Co., the taxpayer, and the Charleston Office Building Co. The first contract was between all of the parties, in the order named, on June 15, 1921, and provides:

Whereas, the party of the second part is about to agree with the party of the third part to demise and lease to said party of the third part, for the period of eleven (11) years, commencing the 15th day of June, 1921, a certain lot or parcel of land belonging to the party of the second part * * * in consideration that the party of the third part issue and deliver to the party of

the second part one hundred and twenty-five thousand dollars ($125,000.00) par value of its seven per cent (7%) cumulative preferred stock, * * * redeemable by said company in the order of the series named, with cumulative dividends thereon, respectively, on the 15th day of June, in the years 1923, 1924, 1925, 1926, 1927, 1928, 1929, 1930, 1931, and 1932, * * *

Whereas, in consideration of one dollar ($1.00) cash in hand paid to the party of the first part, the receipt whereof is hereby acknowledged, and the further consideration of the several undertakings, agreements and covenants on the part of the party of the second part and also of the several undertakings, agreements and covenants on the part of the party of the third part, the party of the first part has agreed to purchase from the party of the second part all of said preferred stock, and to pay him therefor the sum of one hundred and twenty thousand dollars ($120,000.00), at the times and in the manner hereinafter specified; * * *

Now, therefore, in consideration of the premises, it is hereby agreed between and among the said parties of the first, second and third parts as follows,

The party of the second part agrees to make to the party of the third part a lease of the above described premises for the period of eleven (11) years commencing June 15, 1921, and ending June 14, 1932, and to erect a three story brick building thereon, to be used for business or theater and office purposes, to cost not less than fifty thousand dollars ($50,000.00) and the erection of which shall be commenced not later than August 1, 1921, and completed within a reasonable time; and the party of the third part, in consideration thereof, agrees to issue and deliver to the party of the second part one hundred and twenty-five thousand dollars ($125,000.00) par value of its seven per cent (7%) cumulative preferred stock, * * * redeemable by said company in the order of the series named, with cumulative dividends thereon, respectively, on the 15th day of June in the years 1923, 1924, 1925, 1926, 1927, 1928, 1929, 1930, 1931 and 1932, * * *.

The party of the second part does hereby agree with the party of the first part that he will sell said stock to the party of the first part, and the party of the first part does hereby agree that it will purchase said stock from the party of the second part, for the sum of one hundred and twenty thousand dollars ($120,000.00), which the party of the first part agrees to pay to the party of the second part, or at his direction, at the times and in the manner following, to-wit: The sum of forty thousand dollars ($40,000.00) is to be paid to the party of the second part on demand, on, or after June 15, 1921, and when all instruments herein contemplated shall have been executed; the additional sum of not to exceed fifty-five thousand dollars ($55,000.00) is to be paid by the party of the first part upon estimates for the cost of the erection of said building (less the customary percentage retained until the completion thereof), as approved from time to time by the party of the second part, evidenced by the approval of his architect, superintendent or other authorized agent; and the residue, if any, of said sum of ninety-five thousand dollars ($95,000.00), after the cost of erection of said building shall have been fully paid for in the manner aforesaid, and satisfactory proof furnished said first party that no mechanics or other liens exist against said property, shall be paid over to the party of the second part; * * *.

After reciting that the remaining $25,000 should be held by the Central Trust Co. (first party) and used to discharge for the taxpayer (second party) $25,000 indebtedness against certain property mortgaged by taxpayer in this transaction to the Central Trust Co., due October 1, 1922, the agreement further provided:

It is hereby further agreed that if the party of the second part should, before $95,000.00 shall have been fully disbursed, fail to deposit with the party of the first part sufficient funds to take care of the accumulated dividends on the dates due, or to deposit sufficient funds on any date on which the preferred stock may be retired, said party of the first part may set aside, and apply thereto, if it so desires, sufficient funds thereunto out of whatever remains in its hands of said $95,000.00 not then disbursed. * * *.

The contract further recited that all rentals from the building which the taxpayer agreed to construct on the lot leased to the corporation were to be paid to the Central Trust Co., on which sums the

Trust Company was to receive a commission of 2 per cent, and the rentals were to be applied by the Central Trust Co. to the payment of all expenses for repairs, upkeep, taxes, etc., against the building, and—

* * * that said rentals shall not be used for any other purposes than those aforementioned except for payment on account of said dividends at said dividend dates respectively, and for the retirement of said stock at the date on which each respective series is redeemable, but with this further proviso, that the excess, if any, above the amount required for the aforesaid purposes may be used by the first party to retire at 103 any cumulative dividends, all or any part of any outstanding series on the 15th day of June in any year on or after the 15th day of June, 1923, or such excess may be held by said first party at its election in a sinking fund to be created for the purpose of retiring any part or all of said stock and the accumulated dividends thereon at any future retirable date, or may be by said first party at its election, distributed as dividends on the common stock of said third party.

The contract then provided that the taxpayer, in order to secure the carrying out and performance of his several undertakings in this and other contracts hereinafter mentioned, agreed to execute to the Central Trust Co. a mortgage on the lot leased to the Charleston Office Building Co. and, in addition, convey by deed of trust to the Central Trust Co. other property of the approximate value of $300,000.

Simultaneously with the aforementioned agreement, taxpayer entered into a contract with the Charleston Office Building Co., in which it was agreed that the Charleston Office Building Co. should issue to taxpayer $125,000 (1,250 shares) of 7 per cent cumulative preferred stock at par value of $100 per share in consideration of his leasing to the corporation for a term of 11 years a lot on which he agreed to erect an office building at a cost of not less than $50,000. Subsequent to this contract the parties entered into a supplemental contract whereby it was agreed that an additional $50,000 (500 shares) of 7 per cent preferred stock was to be issued to taxpayer in consideration of an agreement to erect a building costing not less than $80,000 instead of a building costing $50,000.

After the execution of the aforementioned agreements and the issuance to J. W. Solof of the 1,250 shares of preferred stock of the Charleston Office Building Co., an agreement was entered into on June 20, 1921, between J. W. Solof and the Central Trust Co., transferring 1,250 shares of stock, together with certain real and personal property, in trust to guarantee the repurchase and the payment of dividends by Solof on the stock to the Central Trust Co. The pertinent provisions of this conveyance follow:

*Whereas,* the said J. W. Solof is the owner and holder of one hundred and twenty-five thousand dollars ($125,000.00) par value of the seven per cent (7%) cumulative preferred stock of the Charleston Office Building Company, * * *

*Whereas,* the said J. W. Solof is desirous of disposing of said stock, and in disposing thereof he agrees, with said second party as Trustee in, for and on behalf of the parties and each of them purchasing same and their assigns, that if the said Charleston Office Building Company shall fail to declare and pay the dividends or fail to redeem said stock all at the dates and in the manner aforesaid, that then he, the said Solof, will on request repurchase said stock from the then holder or holders thereof, or of any of them so desiring, at par plus any dividends accrued and then unpaid with interest upon said unpaid dividends from the date they should have been so declared until such repurchase by him; and to insure the carrying out of said agreement on his part, and as part consideration therefor he, the said Solof, has executed and doth here execute and deliver this indenture, upon the terms and conditions hereinafter set out.

After specifying property of the approximate value of $300,000 conveyed by deed of trust, the conveyance further provides:

*In trust, nevertheless*, That should the said Charleston Office Building Company fail to declare and pay promptly said dividends on the 15th day of June and December in each year until said stock is redeemed or repurchased * * * or fail to redeem said stock on the dates so fixed at which it may be redeemed as aforesaid, then the said J. W. Solof agrees and doth covenant that he will in either event, upon written request of said Trust Company, repurchase said stock not then so redeemed, of the then holders thereof or parts thereof, at the price and in the amount aforesaid, and will for that purpose forthwith deposit with the said Trust Company sufficient moneys to purchase same on his behalf at said price per share, to-wit, the par value of said stock plus any dividends accrued and then unpaid, with interest thereon from the dividend periods or dates at which same accrued; and that upon the failure of said Solof to so repurchase or make said deposit, then and in either event the said Trust Company shall, upon the request in writing of the holder of any of the said preferred stock and being indemnified to its satisfaction for all costs and expenses, proceed to sell the property hereby conveyed, or so much thereof as may be necessary, * * * for so much cash in hand on the day of sale as will pay the costs and expenses of sale, including commissions and an amount necessary to pay all accrued dividends as aforesaid and to repurchase such of said stock as may then be outstanding, and unredeemed, at par and accrued dividends and interest as aforesaid; the residue of said purchase money to be payable as said dividends are payable and said stock redeemable; which purchase money shall be collected, held and applied by said trustee to the payment for said stock and in carrying out on behalf of said Solof the agreement of repurchase aforesaid, applying same as collected to the purchasing of said several series in their order above set out. * * *.

The lien of this indenture may be released and the obligations hereunder arising may be discharged by the said Trust Company, Trustee, when it shall have been shown to said Trustee to its satisfaction that all of said preferred stock of said Charleston Office Building Company has been retired or repurchased by said Solof, and all dividends thereon have been paid to date of such retirement or repurchase; * * *.

The additional $50,000 (500 shares) of the preferred stock issued by the Charleston Office Building Co. to J. W. Solof, mentioned in the supplemental agreement hereinbefore referred to between that corporation and Solof, was transferred by J. W. Solof to the Central Trust Co. under the terms of the contract conveying the 1,250 shares.

Upon the transfer of the $175,000 (1,750 shares) of the preferred stock to the Central Trust Co. with the taxpayer's agreements and undertakings with that bank as to the repurchase or retirement of the stock and the payments of dividends thereon, the amount was disposed of as follows:

| | |
|---|---:|
| Retained by Central Trust Co. to be paid out for taxpayer in the construction of a building on the lot leased to the Charleston Office Building Co | $89,862.43 |
| Retained by the Central Trust Co. to retire $25,000 of bonds against property mortgaged | 25,000.00 |
| Paid over to taxpayer | 52,637.57 |
| Commission of Central Trust Co. (75 shares) | 7,500.00 |
| Total | 175,000.00 |

The sum of $167,500 was advanced to taxpayer in the manner shown by the several agreements at the suggestion of and in conformity with the requirements and conditions prescribed by the Central Trust Co. The purpose of handling the transaction in this manner instead of making the loan directly is shown by the testimony to have been for the purpose of avoiding the payment of local taxes.

The stock was not repurchased nor was the $7,500 commission charged by the Central Trust Co. paid by taxpayer within the year 1921. Subsequently, in 1923, $175,000 (1,750 shares) of the preferred stock was taken up by the taxpayer at par.

### DECISION.

The deficiency should be recomputed in accordance with the following opinion. Final decision will be settled on consent or on seven days' notice in accordance with Rule 50.

### OPINION.

LITTLETON: In this appeal there are four issues to be considered, as follows:

(1) The market value of 225 shares of stock of the Kanawha Land Co.

(2) The correctness of a claimed deduction of $10,000 charged by the Kanawha Banking & Trust Co. for a loan of $90,000.

(3) Whether the transfer of $175,000 of the preferred stock of the Charleston Office Building Co. by the taxpayer to the Central Trust Co. was a sale resulting in a taxable profit, or a loan.

(4) Whether taxpayer is entitled to deduct, in the year 1921, $7,500 charged by the Central Trust Co. for handling the transaction involved in issue No. 3, which amount was not paid by the taxpayer within the year.

The issues will be discussed in their order.

As shown by the findings of fact the taxpayer sold a certain lot, the consideration therefor being three promissory notes, the assumption of outstanding notes against the property, and the receipt of 225 shares, par value $100 per share, of the capital stock of the Kanawha Land Co. Only the value of the 225 shares of stock is in dispute. The Commissioner in computing the taxable gain resulting from this sale, as outlined in the deficiency letter, accepted the consideration of $57,000 reported by the taxpayer in his return for the year 1921. The taxpayer in his appeal alleged, as one of the errors committed by the Commissioner, that the 225 shares of stock of the Kanawha Land Co. should not have been included in any amount in computing the gain resulting from the sale of the lot, for the reason that the stock had no readily realizable market value and that the consideration of $57,000 reported by taxpayer in his return was incorrect. At the hearing the Commissioner contended, and introduced evidence in support thereof, that he was in error in accepting the consideration of $57,000 for the purpose of computing the profit on the sale and that the Board should hold under the evidence that the 225 shares of the Kanawha Land Co. stock received as part of the consideration of the sale of this property had a readily realizable market value of $17,000, or $75.55 per share.

The taxpayer insists that this stock had no readily realizable market value within the meaning of section 202(a) of the Revenue Act of 1921, which provides—

That the basis for ascertaining the gain derived or loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired after February 28, 1913, shall be the cost of such property; except that—

\*     \*     \*     \*     \*     \*     \*

(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value;   \*   \*   \*.

The taxpayer presented no evidence whatsoever in support of his allegations that the stock received by him in this sale had no market value. The evidence introduced shows that the stock of the Kanawha Land Co. was closely held by a group of wealthy business men who did not trade generally in other stock. The books of the corporation show that during the year 1921 there were two cash sales of 10 shares and 200 shares, respectively, for $75 per share, and that two transfers in trade of 200 and 555 shares, respectively, were made. The revenue agent at the time of his investigation, at the suggestion of taxpayer's counsel, interviewed Mr. Staunton, a banker and the principal stockholder of the Kanawha Land Co. as to the fair market value of the stock of that company. Mr. Staunton, in a written statement, fixed the value of this stock at from 75 to 80 per cent of par, but considered the stock which he owned in the company worth par. The mere fact that there were not a great number of sales of this stock during the year 1921 does not establish that the stock did not have a readily realizable market value. In a closely held corporation such as the Kanawha Land Co. there may not be many sales of its stock, but in this case every cash sale realized at least $75 per share, and the evidence before us justifies the opinion that other offers to sell would have realized an equal or greater amount per share. The evidence, in our opinion, preponderates against taxpayer's claim that this stock did not have a readily realizable market value and clearly justifies the conclusion that the stock of the Kanawha Land Co. during the year 1921 had a readily realizable market value, and that the 225 shares of stock received by this taxpayer had a fair market value of $75.55 per share, or $17,000, as now claimed by the Commissioner.

As to the claim of the taxpayer that he should be allowed as a deduction for the year 1921 the sum of $10,000 charged by the Kanawha Banking & Trust Co. for a loan made to him in that year in the amount of $90,000, we are of the opinion that the Commissioner correctly disallowed this deduction. The bank charged $10,000 for making the loan, and the taxpayer executed his promissory note, bearing interest at 6 per cent, for $100,000 and received $90,000. No payments were made on the note during the year 1921. The Commissioner held that since the $10,000 was not paid within the year it is not a legal deduction from gross income, as the taxpayer kept his books and rendered his returns on a cash receipts and disbursements basis.

As to the third issue, there is a wide difference of opinion between the Commissioner and the taxpayer as to the nature of the transaction. The taxpayer claims that the transaction was in reality a loan of $175,000 to him by the Central Trust Co.; that he received only $167,500 and should be allowed as a deduction in the year 1921 the sum of $7,500 commission charged by the Central Trust Co. On

the other hand, the Commissioner claims that the transaction is shown by written agreements between the taxpayer, the Central Trust Co., and the Charleston Office Building Co. to be a sale of preferred stock by the taxpayer, which cost him nothing, to the Central Trust Co. for $167,500, and that this amount should be included as taxable income for the year 1921.

The taxpayer desired to erect an office building on a lot which he owned. He first applied to the Central Trust Co., of Charleston, for a loan of $175,000 for this purpose, as well as for other expenses. The Central Trust Co. declined to lend him the money directly on account of the absence of a market for that class of paper due to high State, county, and city taxes. The bank advised the taxpayer to form a corporation and to issue preferred stock with guaranteed dividends. The vice president of the Central Trust Co. testified on this point as follows:

Mr. Solof wanted to build a building on a lot that he had acquired on Quarrier Street and wanted us to finance him. We agreed to finance him, provided he would form a corporation, let that corporation issue preferred stock, and we would buy the preferred stock from him, provided he guaranteed the preferred stock and dividends and gave us a mortgage on the property and other property and guaranteed that if the corporation did not meet the dividends or the stock when it was retired, that he personally would pay the dividend and retire the stock.

Under our local tax laws—the State, county, and city—the tax rate on bonds is so high that the trust company could not sell bonds. It is as high as 2.17 this year, I think, and it was a scheme that we got up so that we could sell this stock to the public. We were unable to sell local bonds at all on account of that tax rate. In fact, no banks or individuals can make loans on bonds there.

The taxpayer, therefore, at the suggestion of the Central Trust Co., incorporated the Charleston Office Building Co., of which he was the sole stockholder, and caused it to issue first $125,000 and a short time later $50,000 of 7 per cent cumulative preferred stock. The only asset which the Charleston Office Building Co. had was the 11-year lease of the lot, carrying with it the right, during the term thereof, to receive future rentals from the building which the taxpayer agreed to construct, which rentals it agreed to turn over to the Central Trust Co. This $175,000 of preferred stock was transferred by taxpayer to the Central Trust Co., for which he received $167,500; $7,500, represented by 75 shares, being the commission charged by the bank for handling the transaction. Simultaneously with the transfer of the stock to the Central Trust Co., and pursuant to written agreement by the taxpayer personally to retire the stock and pay the dividends thereon according to its tenor, he transferred by deed of trust certain real and personal property of the approximate value of $300,000. The 1,750 shares of preferred stock of the Charleston Office Building Co. had no value except for the personal guarantee of the taxpayer. The vice president of the Central Trust Co. testified that no value whatever was placed upon the stock and that the $167,500 was advanced to the taxpayer upon his agreement to pay the principal and dividends thereon. A year or two subsequent to 1921 taxpayer redeemed the $175,000 of the preferred stock at par.

It will be noted that, at one stage of the proceedings, taxpayer apparently received $167,500 for stock for which he paid nothing.

The Commissioner contends that in deciding this question the Board must look only to the written instruments between the parties; that these agreements show that there was a sale by taxpayer of 1,750 shares of the preferred stock to the Central Trust Co. for $167,500; therefore, the Board should not consider oral testimony introduced to contradict, or explain away, the statements contained in the agreements. This evidence is admissible. *Peugh* v. *Davis*, 96 U. S. 332. The rule against varying or contradicting writings by parol evidence obtains only in suits between and is confined to parties to the writing and their privies and has no operation with respect to third persons nor even upon the parties themselves in controversies with third persons. *Sigua Iron Co.* v. *Greene*, 88 Fed. 207; *O'Shea* v. *New York, C. & St. L. R. Co.*, 105 Fed. 559; *Mitchell* v. *McShane Lumber Co.*, 220 Fed. 878.

The question for determination by the Board is whether this transaction was a loan of $167,500 or a sale of stock resulting in a taxable gain of that amount. Section 213 (a) of the Revenue Act of 1921 provides:

That for the purposes of this title (except as otherwise provided in section 233) the term "gross income"—

(a) Includes *gains, profits, and income* derived from * * * professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from * * * the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. (Italics ours).

It is clear from this section that the principal element of income is gains and profits. Gains and profits, of course, mean that which the recipient has for his own use and benefit.

The word "income" is used in tax laws in its ordinary meaning and not in its strict technical or true economic sense. In its ordinary and popular meaning income is the amount of actual wealth which comes to a person during a given period of time. 26 R. C. L. 147. See also *Eisner v. Macomber*, 252 U. S. 189.

In the case of the *Safe Deposit & Trust Co. of Baltimore v. Miles*, 273 Fed. 822, affirmed 259 U. S. 483, the District Court said:

The statute means what it says, and that is that the tax is to be levied on nothing else except gains, profits, and income, and upon them only when actually realized in money or in money's worth, and in determining what is included therein the courts will look through form to substance. *Doyle v. Mitchell Bros. Co.*, 247 U. S. 179. *Eisner v. Macomber*, 252 U. S. 189.

The evidence shows that the taxpayer incorporated the Charleston Office Building Co., using its preferred stock as a means to obtain a loan of $167,500; that he obligated himself to repay to the bank making the loan more than $175,000—$7,500 of the amount which he agreed to pay in years subsequent to 1921 being a commission charged by the bank. To insure the future payment of more than $175,000 he transferred to the bank by deed of trust approximately $500,000 of his property. The evidence discloses that he did in fact, subsequent to 1921, repay the $175,000, together with interest thereon. We are of the opinion that the transaction was intended as, and in fact was, a loan in 1921 of $167,500 for which taxpayer obligated himself to pay to the bank $7,500 commission.

As to the taxpayer's claim that he should be allowed a deduction of $7,500 for the year 1921 as commission paid to the Central Trust Co. for the loan of $167,500, we are of the opinion that this deduction can not be allowed for the same reasons given for the disallowance of the $10,000 mentioned in the first issue herein. The taxpayer was on a cash receipts basis. He did not pay the $7,500 commission within the year 1921 but only obligated himself to pay that amount at a future time.