# DAVIS *v.* COBLENS.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 246. Argued April 18, 19, 1899. — Decided May 22, 1899.

In this action of ejectment, the evidence of adverse possession contained in the bill of exceptions, and set forth in the opinion of this court, is sufficient to justify the action of the trial court in submitting the question to the jury.

By the terms of the statute in force in the District of Columbia, the time of limitation of this action commenced to run against Lucy T. Davis, one of the plaintiffs in error, on the death of her mother, and as her mother's death took place more than ten years after the cause of action accrued, the term against the plaintiff in error expired in ten years after it accrued, and no disability on her part arrested its running.

It is the general practice to permit tenants in common to sue jointly or separately in ejectment; but if they sue jointly it is with the risk of the failure of all, if one of them fail to make out a title or right to possession.

When a cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion, and the exercise of that discretion is not reviewable on a writ of error.

The plaintiff requested the following instruction : " The jury are instructed that there is no testimony in this case tending to rebut the testimony of the witness John H. Walter that he never conveyed lot 10, in controversy in this case, to any person other than the conveyance by the deed to plaintiffs Charles M. N. Latimer, Lucy T. Davis *and others, and the jury would not be justified in finding to the contrary.*" The court struck out the words in italics, and inserted instead, " and the weight to be given his testimony is a proper question for the jury." *Held* that this was not error.

THE statement of the case will be found in the opinion of the court.

*Mr. Franklin H. Mackey* for plaintiffs in error. *Mr. W. Mosby Williams* was on his brief.

*Mr. J. J. Darlington* for defendants in error. *Mr. W. H. Sholes* was on his brief.

MR. JUSTICE MCKENNA delivered the opinion of the court.

This is an action of ejectment brought by the plaintiffs in error and one Charles M. N. Latimer against the defendants in error for ninety-nine one-hundredths ($\frac{99}{100}$) undivided part of original lot ten (10), in square 1031, in the city of Washington, D. C.

The declaration was in the usual form, and defendants pleaded not guilty, on which issue was joined.

The plaintiffs derive title from Richard Young as heirs at law or grantees of heirs at law. The defendants claim by adverse possession under claim of title under an execution sale upon a judgment recovered against said Richard Young some time in the year 1826.

The case was tried by a jury. Before the case was submitted leave was granted to amend the declaration by striking out plaintiffs Charles M. N. Latimer and William W. Boarman. The verdict was for defendants. And after a motion for new trial was made and denied, judgment was entered in accordance therewith. The plaintiffs appealed to the Court of Appeals, where the judgment was affirmed, and the case was brought here.

There are eleven assignments of error in plaintiffs' brief. All but three relate to instructions given or refused or modified concerning adverse possession. The plaintiffs contended for or objected to instructions which submitted the question of adverse possession to the jury. The other assignments of error will be noted hereafter.

1. The evidence of adverse possession contained in the bill of exceptions is as follows:

"The defendants thereupon further offered evidence tending to prove that on March 8, 1875, Isaac P. Childs, and

grantee of the whole of square 1031 under a deed from
Alexander R. Shepherd, bearing date the 22d day of February,
1875, the same being one of the chain of conveyances offered
in evidence by the plaintiffs as tending to show a common
source of title, took possession of the whole of said square,
converted it into a brick yard, and continued to hold and use
it as such, openly, notoriously, exclusively, continuously, and
in a manner hostile to all the world, until January, 1892,
when he and his immediate grantees sold and conveyed the
said square as an entirety to the defendants for sixty-seven
thousand dollars, of which thirty thousand was paid in cash
and thirty-seven thousand dollars, deferred purchase money,
was secured upon the ground by a deed of trust, upon which
the defendants have ever since paid the interest; that by the
terms of the sale said Childs & Sons were to be allowed until
February, 1893, to remove from said square; that they con-
tinued in occupation and possession of the whole of said
square under said defendants, paying rent therefor down to
the month of October, 1893, with the consent of said defend-
ants, and that they held said square for some time after
October without the consent of the defendants, but not dis-
puting their title, being tenants holding over; that they
removed the greater part of their effects from said square in
the late fall or early winter of 1893–'4, but did not remove
entirely until about the month of May, 1895; that the first
structure placed by them on the square when they took pos-
session in 1875 were two or more brick kilns erected on lot
10, and that these kilns were the last from which the bricks
were removed when they left; that these bricks were in pro-
cess of removal along during the winter of 1893–'4, and that
a part of the machinery used by them in the making of brick,
namely, two large rollers, with which the clay was crushed
before being made into brick, were not removed until May,
1895; that these rollers and some machinery were hauled
away in two four-horse wagons as late as about May 20,
1895; that the machine house was located on the north part
of lot 1, in said square, at or about a point indicated by the
witness Charles Childs on a plat of the square exhibited to

the jury, and that the rollers and machinery were north of the machine house; and on cross-examination in regard thereto the said Charles Childs testified as follows:

" 'I don't know but what the rollers might have been on lot 10. The machine house stood right in here (indicating), and the rollers might have been on lot 10.'

" The defendants further offered testimony tending to show that in November, 1893, the defendant caused four signs to be posted, each about four feet square, to the effect that the entire square was for sale or rent on application to them, one at each corner of the square, one of them being located on lot 10; that some of the old bricks were left on the ground, which the witness thought Childs & Sons abandoned, but they did not charge defendants for them, which were suitable for use in building, and were still there; that defendants made no use of them, but that witness thought they would have used them if they had gone into building operations; that either in the latter part of March or the first part of April, 1894, the defendants rented the entire square to one John A. Downing, who rented it for the purpose of converting it into a base ball park, but did not use it for that purpose; that he occupied the house which was on lot 7 for a dairy lunch and sublet a portion of said house for a barber shop; that the acts he did in reference to the occupation of the vacant ground in that square were as follows: That he prevented various parties from depositing tools, tool boxes and railroad iron on the square, though none was attempted to be deposited on lot 10; that on the said square there were a couple of holes where the brick kilns had existed, and that there are the foundations of some kilns built of brick still there, and that the said Downing remained as such tenant in occupation of the said square, as aforesaid until June, 1895, when he sold his dairy lunch to a Mrs. Schulz, who took possession the same day; that after Isaac Childs & Sons left the square, which was in the winter of 1893–'4, perhaps along in November, December, January and February, they sold certain brick kilns, some of which were on lot 10, to James D. Childs, who in turn sold them to others, by whom they were taken away; that said James D. Childs did

not claim the land said bricks were on; that Mrs. Schulz continued in occupation of the property from June, 1895, down to the time of the trial; that she rented the house with the privilege of using the entire square, provided she neither placed nor permitted others to place anything unlawful upon it, and that she had stopped parties from dumping earth upon the square and from driving across it, though she made no use of it herself.

" The defendants thereupon produced as a witness in their behalf Goff A. Hall, assistant assessor of the District of Columbia, who gave testimony tending to prove that he had examined the tax books from 1875 down to the time of the trial, and that throughout that period the taxes on said lot 10 had been assessed and paid in the name of the defendants and those under whom they claimed.

" Thereupon the plaintiffs in rebuttal gave testimony tending to prove that the brick yard was established some time in the fall of the year 1875 and disappeared some time in 1893, leaving nothing remaining but the remnants of the old brick yard, and that the bricks were all removed from the kilns about March or April, 1894."

We think the evidence was sufficient to justify the action of the court in submitting the question to the jury, and the exceptions based on such action were not well taken.

2. Did the adverse possession apply to the title derived by the plaintiff Lucy T. Davis from her mother, Tracenia Latimer, and to the title of the plaintiff Millard P. McCormick, derived from his mother, Elizabeth McCormick?

It is one of the contentions of the plaintiffs that it did not apply to those titles, and error is based on a refusal of the court to so instruct the jury. The adverse possession began February 22, 1875; suit was brought May 17, 1895. There were therefore twenty years and a few months adverse possession. Richard Young, the common source of title, died in 1860, testate. His will in effect devised the property in controversy to Matilda, his wife, for life; remainder to Tracenia and Elizabeth and other children. Both were then married. Their mother, the life tenant, died October 7, 1874. Tracenia

died November 17, 1879, and her husband April 20, 1880. She left two children, one of whom is the plaintiff. Elizabeth died March 22, 1889. Her husband survived her, but died July 2, 1891. October 14, 1887, she and her husband conveyed their interests to their son, the plaintiff, Millard P. McCormick. From the death of Elizabeth and her husband, five and four years respectively elapsed before suit, and from the date of the conveyance to Millard over eight years. Assuming that Tracenia Latimer and Elizabeth McCormick were under disability when the adverse possession commenced, did that possession ever run against their interests, and if so, when did it commence to run?

The statute of limitations in force in the District is that of James I, c. 16. Under that statute no suit for lands can be maintained, except "within twenty years next after the cause of action first descended or fallen, and at no time after the said twenty years." Additional time is given to those under disability, as follows: "That if any person . . . who shall have such right or title of entry, be, or shall be at the time of the said right or title first descended, accrued, come or fallen, within the age of one and twenty years, *feme covert, non compos mentis,* imprisoned, that then such person and persons, and his and their heir and heirs, shall or may, notwithstanding the said twenty years be expired, bring his action, or make his entry, as he might have done before this act; (2) so as such person and persons, or his or their heir and heirs, shall within ten years next after his and their full age, discoverture, coming of sound mind, enlargement out of prison, or death, take benefit of, and sue forth the same, and at no time after the said ten years." (Sec. 2, p. 359, Compiled Stat. Dist. Columbia.)

More than twenty years elapsed after Tracenia's right accrued, as we have seen, before suit was commenced, and more than ten years of that time accrued after her death and that of her husband. She died under disability, but that made no difference. By the terms of the statute the time of limitation of suit commenced to run upon her death against her heir, Lucy T. Davis, and expired in ten years. No dis-

ability of Lucy T. Davis, if she was under any, arrested the running of the statute. Cumulative disabilities cannot be used to that effect. *Thorp* v. *Raymond*, 16 How. 247; *Demarest* v. *Wynkoop*, 3 Johns. Ch. 129; *Smith* v. *Burtis*, 9 Johns. 174; *Jackson* v. *Johnson*, 5 Cowen, 74; *Walden* v. *Heirs of Gratz*, 1 Wheat. 292; *Hogan* v. *Kurtz*, 94 U. S. 773; *Mercer's Lessee* v. *Selden*, 1 How. 37; *McDonald* v. *Hovey*, 110 U. S. 619.

The bar of the statute was therefore complete against her. But it was not complete against Millard McCormick. Ten years of the period of adverse possession had not run after the death of his parents or after the conveyance to him and before suit was commenced; and we are brought to the contention that a verdict should have been rendered for him. Passing on and disposing of the contention adversely, Mr. Justice Shepard, speaking for the Court of Appeals, 12 D. C. App. 51, 60, said:

"The rule is old and well established, that if one plaintiff in a joint action of ejectment cannot recover, his coplaintiffs cannot. *Morris* v. *Wheat*, 8 App. D. C. 379, 385. Hard as this rule may seem to be, it was followed in that case in obedience to the decision of the Supreme Court of the United States in *Marsteller* v. *McLean*, 7 Cranch, 156, 159. In that case Mr. Justice Story said: 'It seems to be a settled rule that all the plaintiffs in a suit must be competent to sue, otherwise the action cannot be supported.' And again: 'When once the statute runs against one of two parties entitled to a joint action, it operates as a bar to such joint action.' See, also, *Shipp* v. *Miller*, 2 Wheat. 316, 324; *Dickey* v. *Armstrong*, 1 A. K. Marshall, 39, 40.

"There has been no legislation affecting the rule of practice in the District of Columbia, and we do not consider it within our province to make a change therein.

"The apparent hardship to this plaintiff might have been avoided by a separate suit on his own behalf.

"The original rule at common law was, that tenants in common could only sue separately because they were separately seized, and there was no privity of estate between them.

*Mobley* v. *Brunner*, 59 Penn. St. 481; *Corbin* v. *Cannon*, 31 Mississippi, 570, 572; *May* v. *Slade*, 24 Texas, 205, 507; 4 Kent Com. 368.

"The practice soon became general, however, in the United States to permit them to sue either jointly or severally as they might elect. 7 Enc. Pl. & Pr. 316, and cases cited. This seems to have been the practice in the District of Columbia, and, so far as we are advised, has never been questioned. Tenants in common may join in an action if they prefer to do so, but it is with the risk of the failure of all if one of them fail to make out a title or right to possession."

These remarks express the rule correctly.

It was urged at the argument by defendants in error, though not claimed in their brief, that neither Tracenia Latimer nor Elizabeth McCormick were under disability at any time during the period of adverse possession. The argument was that by the married woman's act of April 10, 1869, c. 23, 16 Stat. 45, they were given the same remedies in regard to their property that they would have had if unmarried.

The contention presents an interesting question, and maybe involves the further one whether their husbands ever became tenants by the curtesy. But we need not pass on them. Assuming the disability of Tracenia and Elizabeth and such tenancy, the errors assigned on the instructions given or refused were not well taken.

3. There was introduced in evidence as part of the chain of title of the plaintiff, Lucy T. Davis, a deed from her to John H. Walter and a reconveyance from him to her. From the latter was excepted "so much of all the lands and tenements above mentioned as had been conveyed by the party of the first part (Walter) to other persons prior to the filing of a bill in equity, cause 11,637 of the Supreme Court of the District of Columbia."

Walter was called as a witness by plaintiff; testified that such reconveyance was the only one he had made of lot 10 — the lot in controversy. Thereupon defendant's counsel cross-examined him at great length against the objection of plain-

tiffs, regarding his business of buying and selling real estate and the extent of it and character. The ruling of the court permitting the cross-examination is assigned as error. We see no error in it. The question of plaintiffs' counsel was a general one, and opened many things to particular inquiry. The extent and manner of that inquiry was necessarily within the discretion of the court, even though it extended to matters not connected with the examination in chief. In *Rea* v. *Missouri*, 17 Wall. 532, it was said: "Where the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court in the exercise of a sound discretion; and the exercise of that discretion is not reviewable on a writ of error."

It is also objected that Walter was subjected to discriminating remarks by the court. Plaintiff requested the following instruction:

"The jury are instructed that there is no testimony in this case tending to rebut the testimony of the witness John H. Walter that he never conveyed lot 10 in controversy in this case to any person other than the conveyance by the deed to plaintiffs Charles M. N. Latimer, Lucy T. Davis *and others, and the jury would not be justified in finding to the contrary.*"

The court struck out the words in italics and inserted instead, "and the weight to be given his testimony is a proper question for the jury."

The instruction as requested assumed the credibility of the witness; as modified, that question was submitted to the jury, who were the judges of it, and we cannot suppose that the jury misunderstood the court or believed a discrimination was intended.

To the other assignments of error special consideration is not necessary to be given.

*Judgment affirmed.*