**ELZIG v. GUDWANGEN.**
**SAME v. DANIEL.**
**Nos. 10784, 10785.**

Circuit Court of Appeals, Eighth Circuit.
July 30, 1937.

John A. Senneff, of Mason City, Iowa (Senneff, Bliss & Senneff, of Mason City, Iowa, and Meighen, Knudson & Sturtz, of Albert Lea, Minn., on the brief), for appellant.

Charles S. Kidder, of St. Paul, Minn., and Warren B. King, of Minneapolis, Minn. (Orr, Stark & Kidder, of St. Paul, Minn., on the brief), for appellees.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

Chester T. Daniel, at about two o'clock in the morning of November 20, 1934, was driving his Chevrolet four-door sedan north on U. S. Highway No. 65 in the State of Iowa. He, together with Miss Gudwangen,

Miss Wichmann, and Miss Phillips, were returning from Manly, Iowa (where they had attended a dance), to Albert Lea, Minn., where they resided. Howard L. Elzig was driving a Chevrolet truck (with dual rear wheels), loaded with sacks of potatoes, south on this same highway. The two vehicles met at a point about 1½ miles south of Northwood, Iowa, and sideswiped each other, causing the death of Daniel and Miss Phillips and the serious injury of Miss Gudwangen. An action was brought against Elzig to recover for the death of Chester T. Daniel by the representative of his estate. Miss Gudwangen brought an action to recover for her injuries. The negligence charged against Elzig was the same in both complaints.

Elzig in each case denied that he was negligent, and alleged contributory negligence. The cases were tried together upon the same record and before the same jury. At the close of the evidence, the defendant, Elzig, moved for directed verdicts. His motions were denied. The jury rendered a separate general verdict for the plaintiff in each case. Judgments were entered upon the verdicts. Elzig moved for new trials, but his motions were denied. These appeals followed, and will be disposed of in one opinion.

The errors assigned challenge (1) the refusal of the court to direct verdicts for the defendant, (2) the giving by the court of certain instructions and its failure to give instructions requested, and (3) the overruling of the defendant's motions for new trials.

■ No exceptions were taken to the charge of the court or to the court's failure to give any instruction requested. Therefore, there are no rulings of the trial court with respect to instructions for this court to review.

■ The motions for new trials were addressed to the discretion of the trial court, and its action thereon may not be reviewed by this court. H. F. Wilcox Oil & Gas Co. v. Skidmore (C.C.A.8) 72 F.(2d) 748, 753; Southern Surety Co. v. United States (C.C.A.8) 23 F.(2d) 55, 59; Chicago, B. & Q. R. Co. v. Conway (C.C.A.8) 29 F.(2d) 551, 552; Booth v. Gilbert (C.C.A.8) 79 F.(2d) 790, 793; Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 53 S.Ct. 252, 254, 77 L.Ed. 439.

The only question with which this court is concerned is whether the verdicts of the jury were sustained by any substantial evidence.

The sole ground of negligence with which Elzig was ultimately confronted was that he drove his truck over the center line of the highway into the east lane (the lane to his left), causing the collision with the Daniel car. Elzig contends that upon the trial he proved conclusively that his truck was always west of the center line of the highway, and that the Daniel car came into the west lane and struck his truck at a time when its left wheels were on the pavement west of the center line and its right wheels were on the west shoulder of the highway.

At the time the accident occurred, it was dark and raining. The highway is one of the heavily traveled highways running north and south through Iowa. The concrete pavement was 18 feet wide, and the center was marked by two parallel black lines. The distance from the outside of one of these lines to the outside of the other was 21 inches. The lines were 6 inches wide, with 9 inches of pavement between them. The shoulder on each side of the highway was approximately 9 feet wide, and the width of the entire roadway, including the pavement and shoulders, was approximately 36 feet. Beside Chester T. Daniel, who was driving the Daniel car, sat Miss Gudwangen. In the rear seat Miss Phillips sat on the left and Miss Wichmann on the right. The only windshield wiper was in front of the driver. The highway at the point of the collision was straight, but there was a curve to the east, just south of that point, and the Daniel car had just come around that curve. Elzig and a man named Runge were in the cab of the truck. Elzig was driving. At its widest point, the body or rack of the truck measured 7 feet 6 inches, and the truck and load together weighed approximately six tons. The left front of the Daniel car struck the left front fender and wheel of the Elzig truck. The body of the Daniel car then struck the loaded rack of the truck. The entire left side and the top of the car was carried away, and the left side of the rack of the truck was sheared off. When the two vehicles came to rest after the collision, they were 82 paces or approximately 246 feet apart. The car was on the east side of the highway in the ditch, and the truck, with the left front wheel off, was upon the highway facing in a southeasterly direction, with its front at about the center of the pavement, and the rear wheels on the west

shoulder of the road. The truck had apparently moved from the point of impact at least 30 feet when its left front wheel came off. A scratch on the pavement several inches long running southeast toward the center of the pavement showed where the brake drum of that wheel had come into contact with the pavement before the truck finally came to rest. Potatoes from the truck and débris from the wreckage of both vehicles were scattered over the pavement between the two points where the vehicles eventually stopped. There is testimony tending to show that much, if not most, of the débris was on the west side of the pavement. Other evidence tended to show that most of it was on the east side. The body of Daniel was lying on the east side of the pavement, about 75 feet behind the wrecked sedan. The body of Miss Phillips was lying on the east side of the pavement, between the body of Daniel and the wreck of the sedan. Miss Gudwangen and Miss Wichmann both remained in the sedan until it stopped.

The first vehicle to reach the scene of the accident was a large semi-trailer, with dual wheels, driven by a man named Messer. He had been following the Elzig truck at a distance which he estimates at about two city blocks. He testified that he had been watching the tail lights of the truck, had seen them apparently move over to the right, but did not see the collision. He stopped his semi-trailer a short distance behind and north of the Elzig truck and got out to assist in preventing other vehicles from becoming involved in the wreck. At about the same time, a cattle truck of a Mr. Sater drove up from the south, and stopped on the east side of the pavement about opposite the front of the Elzig truck. A Mr. McGrady, who was with Sater, got out of the cab of the Sater truck to clear away the débris in front of that truck, so that it could go through. Sater went to assist the occupants of the wrecked sedan. He found the two bodies on the pavement, and one woman in the sedan. It appears that Miss Wichmann had gotten out of the sedan before Sater reached it. A touring car driven by a Mr. Larson then came from the south and was stopped. It was filled with young people who had attended the dance at Manly. Those who were in the back seat of the Larson car got out, and Sater and others placed Miss Gudwangen and Miss Phillips in the car. Miss Wichmann, who, it appears, was not disabled, also entered the car, and the injured were then taken in to Northwood

by Larson. Neither Elzig nor Runge, who was riding with him, was hurt.

Miss Gudwangen, Miss Wichmann, Mr. Elzig, and Mr. Runge were apparently the only eyewitnesses of this accident living at the time of the trial. Miss Gudwangen and Miss Wichmann testified positively that the Daniel car was, at the time of the collision, in the east lane of the pavement and that the Elzig truck came into the east lane and struck the Daniel car. Mr. Elzig and Mr. Runge denied that the Elzig truck was ever east of the center line of the highway. Elzig's account of the accident is substantially this: He was driving about 30 miles an hour approaching the curve. He saw the Daniel car as it made the curve. When it was about 250 or 300 feet away, it appeared to him to be going too fast and to be about two-thirds over on the west side of the pavement. The pavement was wet and slippery. Elzig took his foot off the throttle and ran his right wheels onto the soft shoulder of the road and continued in that position, with only about two feet of his truck on the pavement, until his truck was sideswiped by the Daniel car, which, when within about 50 feet of the truck, first swerved to the east and then swerved back to the west, so that it was almost entirely in the west lane at the time it struck his truck. Elzig estimates the speed of his truck, at the time the collision occurred, at 20 miles an hour.

There is, therefore, a direct conflict in the testimony of those who were present when the accident occurred, and if they had been the only witnesses who testified, the case would clearly have been one for the jury. The troublesome question arises from the testimony as to the dual wheel track on the west shoulder of the road apparently made by the Elzig truck.

Elzig testified that, after the débris obstructing the pavement was cleared away and the injured persons were sent to Northwood, he and Messer and two other truck drivers, who had come upon the scene, examined with a flashlight the dual wheel track which his truck had made on the shoulder of the road; that they trailed the track from where his right wheels left the pavement to the point of impact, where the truck wheels skidded, and to the point where the truck came to rest; that there was no track which extended south beyond the truck upon the west shoulder; that the distance from the point where the right wheels left the pavement to the point where the truck came to rest was from 125 to 150 feet;

and that the distance from the point where the wheels skidded and where the bulk of the potatoes lay on the pavement (which it is assumed is where the impact took place) to the point where the truck came to rest was about 30 feet.

Messer testified that he with Clyde McVay and Forrest Malloy examined by flashlight the dual wheel track on the west shoulder from the point where the Elzig truck lay north to the pavement; that in his judgment the track left the pavement 140 to 160 feet north of the truck and extended from that point to the truck; that the largest pile of potatoes on the pavement was about 100 feet south from the place where the dual wheel track left the pavement; that the track was made by one set of dual wheels; that his examination was made by the light of a five-cell flashlight which threw a 1,500-foot beam; that he examined the east side of the highway for the tracks of the Daniel car; that the tracks of that car left the pavement about 6 to 10 feet from the point where it stopped in the ditch.

Clyde McVay testified with respect to the tracks: "Well, we started right by the north side of the Elzig truck, you could see where the grass had been pushed down and mud had been thrown up on to the grass, where the back wheels had slid around to the south on the shoulder, and that run for about 15 or 20 feet north, and then it started the dual tracks in the mud, and we followed them up, right up along the pavement for about 140 or 150 feet;" that there was no other track which crossed the dual wheel track or obliterated it, and there was no difficulty in tracing the track; that he also examined the east shoulder for tracks; that tracks led up to the disabled sedan from a point on the east edge of the pavement 15 or 20 feet south of where the sedan was standing; that dual wheels leave a little ridge of mud in the center of the track.

Forrest F. Malloy testified that he was with Messer and McVay when they examined the dual wheel track apparently made by the Elzig truck on the west shoulder; that the track extended from the pavement for about 175 feet to the truck.

Andrew Aase, who lived at Northwood, at the request of Sheriff Weineth drove a truck to the scene of the accident at about three o'clock that morning, for the purpose of hauling away the potatoes. He testified that there he met Elzig and Runge and another trucker, Alex Mitchell; that he (Aase) stopped his truck north of the disabled truck, and by the light of the headlights of his truck examined the tracks on the west shoulder of the highway; that there was only one dual wheel track upon the shoulder; that the distance from the point where this dual wheel track left the pavement to the place where the Elzig truck stood was 53 paces or 159 feet; that he observed where the right front wheel of the Elzig truck had pushed the dirt in towards the pavement near where that truck stopped; that he also observed where the rear wheels of that truck "had been moved some and then moved some dirt"; that he then, with the lights of his truck and with flashlights, made another examination of the tracks together with the sheriff and Alex Mitchell. On cross-examination, he testified that from the point where the dual wheel track left the pavement to the Elzig truck there was an unbroken and unobliterated track; that it was a straight line; that "one side of the wheels was right up next to the pavement, and the other side was out the width of the truck axle."

Alex L. Mitchell, a resident of Northwood and a truck operator, testified that, at the request of the sheriff, he drove to the scene of the accident in a truck, arriving at about three a. m.; that he parked his truck south of the Elzig truck; that he and the sheriff examined the only dual wheel track on the west shoulder; that there were no wheel tracks crossing this track; that it ran on an angle from the pavement to the Elzig truck for a distance of about 159 feet.

Sheriff Weineth testified that he was notified of the accident shortly after it occurred and visited the scene of it; that there was a dual wheel track on the west shoulder running up to the wrecked truck, and that he followed it to the truck; that he, with Mr. Aase and Mr. Mitchell, checked this track; that it was a fresh track; that there was no difficulty in following it; that it was unbroken down to the Elzig truck and was about 159 feet long; that he observed the tracks made on the east shoulder by the Daniel car; that from the back of the car to where it left the pavement the tracks extended about 10 or 15 feet.

Arthur C. Sater, who drove the cattle truck which arrived upon the scene of the accident from the south almost immediately after it occurred and who, according to his testimony, had been passed by the Daniel car upon the curve just south of where the accident happened, testified that, after stopping in the east lane of the pavement until

débris was cleared away from in front of his truck, he parked his truck facing the north on the west side of the pavement about 60 feet beyond the semi-trailer of Mr. Messer, which stood upon the pavement behind the Elzig truck; that he saw just one fresh dual wheel track on the west shoulder; that it ran in a straight line north to a point where it went onto the pavement; and that the track ran south behind his truck toward the Elzig truck.

At about 2:30 p. m. of the day of the accident, Mr. Lock, a photographer of Mason City, Iowa, took some pictures at the scene of the accident. By that time both disabled vehicles had been removed. Lock testified that he traced a dual wheel track on the west shoulder of the highway from a point where it left the pavement to a point where it ended among smashed potatoes and minor pieces of wreckage and marks on the shoulder where the wheels of a truck had apparently slid; that the dual track was plainly visible and was the only dual track upon the west shoulder at that point; that he marked the course of the dual track with stakes and took pictures showing its extent and location. The pictures are in evidence.

The situation with which we are confronted, then, is this: Miss Gudwangen and Miss Wichmann, both interested in the outcome of this case but both competent witnesses who were present at the time of the collision and could have known how it happened, have testified that the Daniel car was in the east lane of the highway and that the Elzig truck ran into it. They are contradicted by the testimony of Elzig and Runge, the occupants of the truck, and are further contradicted by the testimony relative to the track of the Elzig truck on the west shoulder of the highway, most of which testimony was given by apparently disinterested and credible witnesses who were not impeached. If the track which the witnesses described was the track which the Elzig truck made, then the Elzig truck was at all times which are material on the west side of the highway, and the accident was due solely to the negligence of Daniel. There is some testimony in the record, on behalf of the plaintiffs, that the right wheels of the Messer semi-trailer, which were dual wheels, were off the pavement and on the west shoulder; but, if that testimony were to be accepted, it would not disprove the existence of the track leading to the Elzig truck. At best, it would do no more than indicate that the witnesses testifying as to the tracks might have mistaken the track of the Messer truck for that of the Elzig truck for a part of the distance. But the tracks of the Messer truck could not have led up to the rear wheels of the Elzig truck, since the Messer truck stopped behind the Elzig truck and left before the Elzig truck was removed.

While our examination of the evidence contained in the record indicates to our minds that the accident, in all probability, happened just as Elzig said it happened, the question before us is, not what the jury's verdict should have been under the evidence, but whether, at the close of the trial, the question of the alleged negligence of the defendant was one of law for the court or one of fact for the jury. We are required to determine whether there is any substantial evidence upon which the verdicts for the plaintiffs could properly be based. For the decision of that question, we must assume as established all the facts that the *evidence supporting the plaintiffs' claims* reasonably tends to prove and that there should be drawn in the plaintiffs' favor all the inferences fairly deducible from such facts. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Lumbra v. United States, 290 U.S. 551, 553, 54 S.Ct. 272, 273, 78 L. Ed. 492; Svenson v. Mutual Life Ins. Co. of New York (C.C.A.8) 87 F.(2d) 441, 442. We must also give effect to the rule that issues that depend upon the credibility of witnesses, and the effect or weight of evidence are to be decided by the jury. Gunning v. Cooley, supra, 281 U.S. 90, at page 94, 50 S.Ct. 231, 233, 74 L.Ed. 720; Svenson v. Mutual Life Ins. Co. of New York, supra, 87 F.(2d) 441, at page 443. The literal application of these rules would require an affirmance of the judgments, since two persons who were present at the happening of the accident have testified directly that the defendant's truck struck the Daniel car in the east lane of the pavement.

But the defendant contends that the evidence which he introduced as to the location of the truck after the accident, about which there is no serious dispute, and the evidence as to the track of the dual wheel of his truck upon the west shoulder of the highway, completely destroyed the probative value of the plaintiffs' evidence, because their evidence was, thereafter, opposed to physical facts which had been conclusively established.

440

■ The rule that oral evidence which is opposed to undisputed physical facts is not substantial evidence—which is another way of saying that neither court nor jury is permitted to believe that which is obviously untrue—is well settled. Missouri, K. & T. Ry. Co. v. Collier (C.C.A.8) 157 F. 347, 353, certiorari denied 209 U.S. 545, 28 S.Ct. 571, 52 L.Ed. 920; St. Louis Southwestern Ry. Co. v. Britton (C.C.A.8) 190 F. 316; American Car & Foundry Co. v. Kindermann (C.C.A.8) 216 F. 499, 502; United States v. Harth (C.C.A.8) 61 F.(2d) 541, 544; United States v. Hill (C.C.A.8) 62 F.(2d) 1022, 1025; Ed S. Michelson, Inc., v. Nebraska Tire & Rubber Co. (C.C.A.8) 63 F.(2d) 597, 600, certiorari denied 290 U. S. 634, 554 S.Ct. 52, 78 L.Ed. 551; Chicago, M., St. P. & P. R. Co. v. Linehan (C.C.A.8) 66 F.(2d) 373, 380; Liggett & Myers Tobacco Co. v. De Parcq (C.C.A.8) 66 F.(2d) 678, 683; Jacobson v. Chicago, M., St. P. & P. R. Co. (C.C.A.8) 66 F.(2d) 688, 693; Booth v. Gilbert (C.C.A.8) 79 F.(2d) 790, 795; Blackley v. Powell (C.C.A.4) 68 F.(2d) 457, 459; F. W. Woolworth Co. v. Davis (C.C.A. 10) 41 F.(2d) 342, 347; Chambers v. Skelly Oil Co. (C.C.A.10) 87 F.(2d) 853, 856.

■ If the location of the truck and the location of the Daniel car after the collision had conclusively demonstrated that the collision took place in the west lane of the pavement, we would have no hesitation in holding that the testimony of Miss Gudwangen and Miss Wichmann that it took place in the east lane would have to be rejected. We are satisfied that neither the location of the truck nor the location of the car conclusively proves in which lane the collision took place. It is perhaps reasonable to suppose that the truck would have stopped farther east than it did if the collision occurred in the east lane, since it was the heavier of the two vehicles and could not, perhaps, have moved far westwardly after the collision. It also seems probable that the Daniel car would have caromed off the truck into the ditch sooner than it did if the collision occurred in the east lane; but it cannot be said with certainty that such would be the case. The probative effect of the evidence as to the location of the vehicles when they came to rest was for the jury to determine.

That brings us to the question whether the testimony as to the dual wheel track of the Elzig truck on the west shoulder of the road must be regarded as conclusive because not directly contradicted. Aside from El-zig, the witnesses who testified to the existence of the track were, upon the face of the record, disinterested and credible. Their testimony was reasonable and they were not impeached. If they told the truth and if the track which they saw was the track of the Elzig truck, then the testimony that the collision took place in the east lane is incredible. On the other hand, if the collision took place in the east lane, as Miss Gudwangen and Miss Wichmann testified, then there was no track such as described or. the west shoulder of the road, or, if there was, it was not the track of the Elzig truck.

■ It is elementary that in the trial of an action at law, the jurors are the sole and exclusive judges .of the facts, of the credibility of the witnesses, and of the weight of the evidence. Evidence which is uncontradicted is not necessarily to be accepted as true. Its weight and the credibility of the witnesses who gave it are usually for the jury to determine.

In Davis v. Coblens, 174 U.S. 719, 19 S.Ct. 832, 43 L.Ed. 1147, error was assigned to the refusal of the court to give a requested instruction with respect to certain uncontradicted evidence. The Supreme Court said (174 U.S. 719, at page 727, 19 S.Ct. 832, 835, 43 L.Ed. 1147):

"It is also objected that Walter was subjected to discriminating remarks by the court. Plaintiffs requested the following instruction:

" 'The jury are instructed that there is no testimony in this case tending to rebut the testimony of the witness John H. Walter that he never conveyed lot 10 in controversy in this case to any person other than the conveyance by the deed to plaintiffs Charles M. N. Latimer, Lucy T. Davis, *and others, and the jury would not be justified in finding to the contrary.*'

"The court struck out the words in italics, and inserted instead, 'and the weight to be given his testimony is a proper question for the jury.'

"The instruction as requested assumed the credibility of the witness; as modified, that question was submitted to the jury, who were the judges of it, and we cannot suppose that the jury misunderstood the court or believed a discrimination was intended."

Toledo, St. L. & W. R. Co. v. Connolly (C.C.A.6) 149 F. 398, involved an action in which it was claimed that a mill superintendent named Duffy was accidentally killed by having cars shunted in on a switch, with-

out notice to him, at a time when he was engaged in unloading other cars at the mill. The vital question was whether, before these cars were sent in, notice had been given to the deceased. The court said (page 399):

"Counsel assumed that because Turner, supported by Smith, testified that Duffy, some 20 minutes before the accident, gave him a list of the cars to be taken from and the cars to be put upon the Maize Company's switch, saying, 'Come right away, just as soon as you can,' and he replied 'All right, Pat, I will be there right away,' that all the notice required had been given, and since there was no witness to contradict this statement, Duffy being dead, it must be accepted as the truth, and this claim of negligence eliminated. The court was asked to charge that 'while the jury are the judges of the credibility of the witnesses, yet the jury has no right to disregard the uncontradicted testimony of a witness whose credibility and veracity are unimpeached.' This the court gave as correct in the abstract, but, applying it to the case in hand, reminded the jury that a witness might be contradicted, not simply by a witness swearing to the opposite, but by the improbability of his story, and by anything, either in the testimony as given or in the circumstances of the case presented, which in the judgment of the jury, tended to discredit his statements. 'Common sense,' said the court below, 'is to be applied here as everywhere; and no technical rule of law harnesses your judgment or controls your common sense view of what is the truth, when it comes from the witness stand. You are the judges of that.'

"We find nothing to criticise, but something to admire, in the lucid definition given by the court of the word 'contradicted' as applied to testimony given in the course of the trial."

In Fire Ass'n of Philadelphia v. Mechlowitz, 266 F. 322, at page 325, the Circuit Court of Appeals of the Second Circuit discussed this same subject as follows:

"In Craft v. Northern, etc., Co. (C.C.) 62 F. [735] at page 739, affirmed 69 F. 124, 16 C.C.A. 175, it is said to be the province of the jury to pass upon the credibility of all witnesses whether they are contradicted or not; and while a witness is presumed to speak the truth, the manner in which he testifies and the character of his testimony are sufficient to overcome that presumption. (This language, although quoted in part from the Code of Oregon, is but declaratory of historic law.) We held in Sigua Iron Co. v. Greene, supra [88 F. 207, 210], that the testimony of a party on a material issue, though uncontradicted, should be submitted to the jury, if his adversary so requests.

"The matter is well summed up in Toledo, etc., Co. v. Connolly, 149 F. 398, 79 C.C.A. 218. There the trial judge had been requested to charge almost in the language of Second National Bank v. Weston, supra [172 N.Y. 250, 258, 64 N.E. 949, 952]. The court did so, but—'applying it to the case in hand, reminded the jury that a witness might be contradicted, not simply by a witness swearing to the opposite, but by the improbability of his story, and by anything, either in the testimony as given or in the circumstances of the case presented, which in the judgment of the jury tended to discredit his statements.'

"The court added:

"'Common sense is to be applied here as everywhere; and no technical rule of law harnesses your judgment or controls your common-sense view, of what is the truth, when it comes from the witness stand.'

"We think this well put."

In Norton v. United States (C.C.A.8) 205 F. 593, 600, 601, certiorari denied 235 U.S. 699, 35 S.Ct. 200, 59 L.Ed. 432, this court said:

"The jury, by their verdict, necessarily found that the testimony of the defendant in this respect was untruthful. It is true, there was no direct testimony contradicting that given by defendant and Blaise, and, while the jury should not arbitrarily disregard the testimony of any witness, they have a right, in determining its credibility, to consider all of the surrounding facts and circumstances in connection with the transaction, and the manner and appearance of the witness in giving his testimony.

"As said by the Supreme Court, in Quock Ting v. U. S., 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501:

"'Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony;

and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying, may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced.'

"Applying that principle to this case, while there was no direct evidence contradicting the testimony of the defendant and Blaise, in regard to this transaction, it was for the jury to determine its credibility by considering the reasonableness of their statements, and the manner in which they gave their testimony. The reasonableness may be considered by this court; the manner in which they gave their testimony cannot be, of course, correctly portrayed."

After pointing out certain circumstances which might properly induce the jury to discredit the uncontradicted testimony, this court concluded (205 F. 593, at page 602): "So, we think the court did not err in refusing to direct a verdict for the defendant in respect to this transaction."

In Southern Pac. Co. v. Hanlon (C.C.A. 9) 9 F.(2d) 294, at page 296, the court quoted with approval the following language from Elwood v. Western Union Telegraph Co., 45 N.Y. 549, 553, 6 Am.Rep. 140: "It is undoubtedly the general rule that, where unimpeached witnesses testify distinctly and positively to a fact and are uncontradicted, their testimony should be credited and have the effect of overcoming a mere presumption. * * * But this rule is subject to many qualifications. There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made. The witnesses, though unimpeached, may have such an interest in the question at issue as to affect their credibility, * * * and furthermore it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by circumstances, as well as by statements of others contrary to his own. In such cases, courts and juries are not bound to refrain from exercising their judgment and to blindly adopt the statements of the witness, for the simple reason that no other witness has denied them, and that the character of the witness is not impeached."

In Lowenstein v. I. N. Platt & Co. (C.C.A.2) 58 F.(2d) 173, 174, the court said: "To decide the actual date of the transfer requires that the credibility of these witnesses be passed upon, and in that we are handicapped, as we are in all such appeals, by having to judge only from the printed record. The men on the jury who saw these witnesses did not believe them. * * * The court was not bound to believe these witnesses, though they were neither impeached nor contradicted except by whatever improbability there was that their testimony was credible in view of the circumstances shown and what the trial judge and jury could determine about it from such acquaintance with them as was afforded by their appearance as witnesses and the setting in which the evidence in the case put them. See Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501. As the facts on which the trial judge based his decision were supported by evidence it was reasonable to believe, it is unavailing on this appeal to point out evidence to the contrary."

In Yutterman v. Sternberg (C.C.A.8) 86 F.(2d) 321, 324, Judge Faris, who delivered the opinion of the court, said:

"But counsel for appellant strenuously contends that taking the testimony of the witnesses at its face value, which he insists this court must do, it conclusively shows that both claims represented honest and bona fide debts due to the appellant. It may be conceded for the sake of the argument that judged by mere lip-service this is true. But the insistence overlooks the legal prerogative of the referee, the trier of the facts. His was the lawful privilege of taking into consideration the manner and appearance of the witnesses on the stand; their way of testifying; the probability or improbability of the testimony which they gave; their respective opportunities to see and hear the things about which they gave testimony; and their apparent capacity and willingness to truthfully and accurately relate what they saw and heard. He could consider the contradictions, errors, and improbabilities in the situation as detailed, and the kinship and business relations of the witnesses, and doing all these things, which were among his legal rights, reach the truth if he could.

"The rule as to deference due to a referee has been stated lately by us in the case of Rasmussen v. Gresly, 77 F.(2d) 252. The late Judge Lamm has given us in graphic language embodying both good law and

good literature, in the case of Creamer v. Bivert, 214 Mo. 473, loc. cit. 479, 113 S.W. 1118, 1120, the reasons back of the rule, thus: 'The bulk of the testimony was oral. In such condition of things, while this court has said over and over again that the whole record must come here in equity cases, so that (sitting as the final arbiter in chancery) we may weigh and decide de novo and thus do equity, yet the court is also fond of saying that deference should be given to the trial chancellor. He sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sigh, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson, or the itching overeagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light, and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify. Therefore, where an issue in equity rests alone on the credibility of witnesses, the upper court may with entire propriety rest somewhat on the superior advantage of the lower court in determining a fact.' "

See, also, F. T. Dooley Lumber Co. v. United States (C.C.A.8) 63 F.(2d) 384, 388; Spiro State Bank v. Bankers' Nat. Life Ins. Co. (C.C.A.8) 69 F.(2d) 185, 188; Rasmussen v. Gresly (C.C.A.8) 77 F.(2d) 252, 253, 254; United States v. Cole (D.C.W.D.Tex.) 153 F. 801, 807; Petition of Diamond Coal & Coke Co. (D.C.W.D.Pa.) 297 F. 242, 245.

 We think that the evidence in this case as to the wheel track of the Elzig truck on the west shoulder of the highway was not, in a broad sense, uncontradicted evidence, and was not the kind of evidence which could be accepted blindly and without regard to the credibility of the witnesses who gave it and the weight which should be accorded to it. The wheel track had ceased to exist shortly after the happening of the accident. Its existence at the time of the collision was not a fact easily disproved. In determining the weight of the evidence as to the wheel track, the jury could properly consider the opportunities which the witnesses had to know the things about which they had testified and the possibility of their making accurate observations and reaching accurate conclusions in the rain and dark and under the circumstances as disclosed by the evidence. Apparently the dual wheel track led up to the point which is assumed to be the point where the collision took place. From there on the wheels of the truck apparently skidded and slipped. Whether the dual wheel track which left the pavement could be positively identified as being made by the same wheel from the point of skidding, might be questioned. It is conceivable—although not probable—that the Messer truck might have made a dual wheel track on the shoulder of the road up to the point where the collision occurred and the truck commenced to skid.

This is clearly not a case where a mere inference of negligence can be said to be rebutted by positive evidence to the contrary—like Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, in which it was claimed that a brakeman came to his death because of a collision between two strings of cars as to which collision there was no direct evidence, but only the testimony of a witness Bainbridge that from a distance he had heard a crash and had seen the two strings of cars apparently moving together, and where there was direct and positive evidence that there had been no collision. In that case the Supreme Court said (288 U.S. 333, at page 339, 53 S.Ct. 391, 393, 77 L.Ed. 819): "There is no direct evidence that *in fact* the crash was occasioned by a collision of the two strings in question; and it is perfectly clear that no such fact was brought to Bainbridge's attention as a perception of the physical sense of sight or of hearing. At most there was an inference to that effect drawn from observed facts which gave equal support to the opposite inference that the crash was occasioned by the coming together of other strings of cars entirely away from the scene of the accident, or of the two-car string ridden by deceased and the seven-car string immediately ahead of it."

Neither is this such a case as Chesapeake & Ohio Railway Co. v. Martin, 283 U.S. 209, in which it was said on page 216, 51 S.Ct. 453, 456, 75 L.Ed. 983: "We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination." The testimony of the agent in that case was directed to the issue whether twenty days was a reasonable time for the delivery of a car to a consignee. The agent had testified that the time ordinarily required for delivery would be less than twenty-four hours. This evidence was unchallenged by other evidence and circumstances and was corroborated by the undisputed facts in respect to the movement of the shipment in suit. The Supreme Court held that, under such circumstances, a jury might not be permitted to find that twenty days was a reasonable time for delivery. This was saying little more than that a jury in deciding an issue of fact, where the evidence is all one way, will not be permitted to make a finding contrary to such evidence. Moreover, the evidence related to a fact which could easily have been disproved at the time of the trial if untrue.

It is well known that in actions at law, defenses are sometimes interposed which are easily fabricated and hard to disprove. One of such defenses is an alibi in a criminal case. If the uncontradicted evidence of apparently credible witnesses, who are unimpeached, as to the facts tending to establish an alibi, must be accepted as true by a trial court, a defendant who had been positively identified by his victim would often go free. The truth is, of course, that the evidence tending to prove that the defendant was elsewhere than at the scene of the crime, though not directly contradicted by other evidence on that point, is inferentially contradicted and rendered highly improbable by that evidence which tends to show that he committed the crime; so that the alibi evidence goes to the jury along with the rest of the evidence, and its finding as to the issue of guilt or innocence conclusively determines the fact of the defendant's presence at, or absence from, the scene of the crime at the time of its commission.

So in this case, the evidence as to the wheel track of the Elzig truck on the west shoulder of the road, while not expressly contradicted by any evidence to the contrary upon that point, is inferentially disputed by the testimony of the two young women in the Daniel car. Reliance upon their testimony would, of course, preclude reliance upon the testimony of the defendant's witnesses which corroborated his account of the manner in which the accident happened.

While our examination of the record indicates to us that the verdicts of the jury are contrary to the weight of the evidence, and while we think a new trial of this case would be in the interests of justice, we are convinced that, at the close of the trial, the issue of negligence was one of fact for the jury and not one of law for the court, and that, if the verdicts are erroneous, the error was an error of fact committed by the jury and not an error of law committed by the court. This court may not retry an action at law and render such judgment as it thinks should be rendered. United States v. Washington Dehydrated Food Co. (C.C.A.8) 89 F.(2d) 606, 609, 610. While the court below, upon the motion for a new trial, could very properly have concerned itself with the question whether the verdicts were contrary to the greater weight of the evidence and whether the jury had disregarded evidence which there was no justification for disregarding, the weight of the evidence is no concern of this court, Booth v. Gilbert (C.C.A.8) 79 F.(2d) 790, 792, 793, and "appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct," Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439.

Our conclusion is that the verdicts of the jury cannot be said to be unsupported by any evidence.

The judgments are affirmed.