**UNITED STATES FIRE INSURANCE COMPANY, a corporation of New York, and Western Fire Insurance Company, a corporation organized in the State of Kansas, Appellants,**

v.

**MILNER HOTELS, Inc., a North Dakota corporation, Appellee.**

**No. 15716.**

United States Court of Appeals
Eighth Circuit.

April 1, 1958.

P. W. Lanier, Sr., Fargo, N. D. (Lanier, Lanier & Knox, Fargo, N. D., with him on the brief), for appellants.

J. Gerald Nilles, Fargo, N. D. (Nilles, Oehlert & Nilles, Fargo, N. D., with him on the brief), for appellee.

Before GARDNER, Chief Judge, and JOHNSEN and VOGEL, Circuit Judges.

JOHNSEN, Circuit Judge.

Appellants are fire insurance companies. They had issued policies upon a restaurant located in the Earle Hotel at Fargo, North Dakota. The restaurant space was leased by the insured from appellee, which was the owner and operator of the hotel. The building, including the restaurant, was destroyed by a fire, which occurred on December 13, 1951.

The loss to appellants' insured from the fire was $19,975, which they paid to him under their policies. They took subrogation receipts and later brought suit against appellee to recover the amount of their payments, on the ground that the fire and their insured's loss had been occasioned by appellee's negligence.

The jury returned a verdict for appellee, and appellants seek reversal here, urging as error the trial court's denial of their motion for a directed verdict and of their motion for judgment notwithstanding the verdict.

It is their contention that the evidence required the holding as a matter of law that appellee was guilty of lack of due care in having allowed the electric wiring system of the hotel to remain in its existing condition, and further that this condition necessarily had been the cause of the fire.

There was evidence showing, without dispute, that the Fargo Fire Department had made periodical inspections of the hotel, as of all the buildings in the downtown section of the city, and routinely called to the manager's attention any general or special conditions throughout the building which they felt should be corrected or noted. None of the inspections occurring prior to October, 1951, are of special significance here, except perhaps in relation to the criticism orally voiced to the manager about drop cords which had been attached to the ceiling fixtures in many of the rooms and their seeming use by the tenants for appliance purposes, as indicated by the presence of a heater plate, or a coffee pot, or a toaster, etc., in some of the rooms. The manager was on each of the inspection occasions requested generally to see that the tenants did not put the drop cords to such use. There were no other outlet sockets in the rooms, to which appliances could be connected.

Ordinarily, a letter was also sent to the manager after each inspection, with general, precautionary recommendations, conventional to other business buildings as well, such as that "a licensed electrician be hired to check all the wiring"; that "a check be made to determine if the circuits are overloaded"; and that "if the circuits are overloaded, additional circuits be installed".

In October, 1951, however, following a regular inspection, the Assistant Fire Chief, who was the head of the Fire Prevention Bureau, made the direct recommendation, in his letter to the hotel manager, that "sufficient out-let sockets be installed to eliminate the improper use of extension cords".

No demand was made for any concrete or immediate action on the part of the hotel. Under the ordinances of the city, such a demand could legally be made by the city electrical inspector, for a 48-hour correction of any hazardous electrical condition which he should find to exist in a building, and with authority in him to cut off the supply of electricity, if the correction was not so made.

In November, 1951, the city electrical inspector, presumably at the request of the fire department, purported to make a general inspection of the wiring system of the hotel. Under date of November 27th, he addressed a letter to the manager of the hotel, stating that his examination convinced him that "the entire electric wiring system within said hotel is unsafe as well as inadequate regarding the safety of occupants and adjacent property"; that he should have to officially insist that "all deteriorated wiring be replaced"; and that he would "appreciate your co-operation on this matter at the earliest possible date".

The next day, November 28th, he sent another letter to the manager, in which he specifically ordered that correction or replacement be made of a "60 ampere disconnect" switch, the circuit of which was feeding the outlets in some of the rooms on the second and third floors of the hotel. It was on the third floor that the fire which occurred on December 13th was discovered.

The letter made no other express requirement than that the particular switch be corrected or replaced. As produced from the files of the fire department, the letter was in form a "public demand", stating as to the "60 ampere disconnect" referred to, as follows: "This condition is a fire hazard and must be taken care of. We recommend proper fuse panel installed or service will be discontinued. Time limit 48 hours after notice has been served. The location being in basement of building—part 4½".

The testimony of the city inspector on the witness stand could, however, be viewed by the jury as not being as impressive or authoritative with respect to the situation as his two letters had purported to be. Thus, he admitted, in relation to his first letter, that he had not intended, nor did he state to the manager, that there had to be a whole new wiring system for the hotel. What he primarily desired done, he said, was to have some additional circuits put in, with the electrical contractor who might be employed being left free to exercise his judgment and make use of whatever parts of the old system "he deemed satisfactory for use". And as to his demand of the following day, for correction of the "60 ampere disconnect" condition, he stated that his purpose was to get a 60 ampere cartridge-fuse installation, which he had found existing, replaced by a panel of 15 ampere plug fuses. This was because of the fact that the general wiring system of the hotel consisted of No. 14 wire, for which the testimony showed that the proper fusing was 15 amperes. So far as the evidence indicates, all the rest of such circuits in the hotel were thus fused, and the "60 ampere disconnect", which was made the subject of demand, was the only one that required correction or reinstallation in this respect.

The "public demand" letter of November 28th, to have the improperly fused switch-installation replaced, contained a certificate form at the bottom, for execution and showing that the change or correction required had been made. The letter served upon appellee, as introduced in evidence, had had the certificate form at the bottom filled out by a licensed electrician in Fargo, as follows: "I hereby certify that the changes listed hereon have been made on the premises of Earle Hotel * * *. Description of changes, wiring corrected as specified above" (pur-

portedly referring to the letter of demand as contained above it).

The electrician testified that, following appellee's receipt of the letter and before the time of the fire, he had removed the 60 ampere switch located in the hotel and put in a new panel with 15 ampere plug-type fuses, thus breaking down the installation, in order "to have more circuits so the wire wouldn't be overloaded". The effect of his testimony was that this had been done by him at the request of the hotel manager, for the express purpose of satisfying the requirement made by the city electrical inspector, and that it had, as he believed, corrected the situation to which the letter referred.

In the body of the demand letter, however, where the copy from the fire department's file contained the words "The location being in basement" etc., there had been a change made in the one on which the witness's certificate appeared, of the word "basement" to "storeroom", so that the sentence read, "The location being in storeroom of building—part 4½". The change was made in ink of the same color as that used in the certificate and was apparently in the handwriting of the employee of the electrician, who had filled out the certificate in his behalf. There was testimony establishing that the building contained a half floor used as a storeroom, located between the third and the next-higher room floor.

It was the electrician's recollection and testimony on the trial (which occurred approximately five years after the fire) that it was in this storeroom that the condition existed which he corrected and to which at the time he regarded the city electrical inspector's letter as having application.

Appellants argue that the jury could not be allowed to find from this equivocal evidence that there had been any correction or attempt at correction by appellee of the inspector's requirement, since the letter and the testimony of the inspector showed that the switch involved was located in the basement and not in the upper-floor storeroom, where appellee's electrician claimed to have installed the new fuse panel.

We think that the trial court properly viewed these disparities in exhibits and testimony, and the question of negligence which might inhere them, as constituting a matter that was wholly within the province and competence of the jury to resolve, and as not representing a legal absolutism for the court. Involved in a consideration and resolution of the ultimate answer could be the factors that the evidence, as previously noted, did not establish that more than one improperly fused panel or "60 ampere disconnect" had existed in the hotel; that while the inspector's letter and his testimony gave the location of the installation as in the basement, he had added at the close of the locational sentence in the letter the unexplained words "part 4½", whose interpretation and significance were left to the light of the evidence generally; and further that some implication on the question of appellee's attempted compliance and correction would perhaps be capable of inhering in the fact that the city had not cut off the hotel's electrical service, at the expiration of 48 hours or thereafter, under the ultimatum of the demand letter.

Beyond this, whether the correction and installation testified to by appellee's electrician had in fact satisfied the city inspector's requirement, it would be possible for the jury, if it believed the electrician's testimony, to regard appellee's turning over of the matter to the electrician and the latter's efforts to deal with the demand as amounting to such a measure of attempted exercise of care as not to leave appellee guilty of negligence in respect to a correcting of the switch situation.

Again, on the question of negligence as to the condition of the wiring system generally and appellee's duty to have had it immediately gone over, here too it is not possible to say, we think, that the facts of the situation were of such legal absoluteness as to entitle the court to take the matter from the jury, on the

basis of compelled awareness and required action between November 27th and December 13th.

No immediate or determinative mandate was issued by the city inspector as to the checking of the wiring system generally. He made no direct condemnation of any specific part of it. The broad statement in his letter of November 27th, that "the entire wiring system is unsafe as well as inadequate", may also have lost some of its purported significance before the jury, in relation to his testimony on the witness stand, as referred to above, and to his impulsive attitude and apparent demeanor on the trial, as suggested by the record before us.

Again, the jury could give consideration to the testimony of the Chief of the Fire Department that the condition of the wire, as to insulation, etc., had appeared to him, in his inspectional observations of it to be physically good. What the Chief felt the hotel primarily needed was more circuits and outlets. But he had not assumed to translate this into any express demands as against the hotel. And he admitted that an overloading of a circuit of No. 14 wire, where it was fused with a 15 ampere plug, as he testified he had always found existing, would ordinarily have the consequence merely of blowing the fuse and thereby breaking the circuit.

On all these aspects of testimony and circumstance, it cannot in our opinion be said that the trial court was required to hold that appellee's failure to have had its general wiring system gone over, between November 27th and December 13th, constituted negligence as a matter of law.

■ Equally, must we hold that the trial court also was warranted in leaving the question of proximate cause to the jury.

Appellants sought to have the trial court declare, and they argue here, that the cause of the fire necessarily was a short-circuiting or arcing of electrical current between the two wires of a circuit, from an overloading thereof. There was persuasive expert testimony to support this theory. But neither the seeming soundness of the theory nor the persuasiveness of the expert opinions to support it can be declared to have given rise to a legal certainty in the field and situation involved.

Arcing admittedly is not such a general and regular consequence of the overloading of a circuit, as against the normal incidence of fuse-plug blowout, as to compel translation legally of all reconcilable circumstances into necessary harmony instead of disharmony with it. Thus, the jury was not precluded as a matter of law from believing, contrary to the view of appellants' experts, that the burned condition of the covering of a particular segment of wire, which appellants attributed to arcing, could have been a result of the fire itself, rather than its source or cause. And supportive of that hypothesis, if the jury chose to accept it, was the circumstance, as testified to by members of the fire department, that the fire had had its center in one of the guest rooms, where it could have arisen from other cause, and not in the hallway, which would have been its natural seat, if the arcing, which appellants claimed existed, had been its immediate source.

Further, in this connection, the jury may have accorded significance to the fact, as appearing in the evidence, that the fire department, after making investigation for that express purpose, including examination of the wire segment claimed to be arced, had come to the official conclusion and result that it was not possible for it to fix or resolve the cause of the fire.

■ In relation to what has been said, it must conformingly be borne in mind that under North Dakota law, as generally, negligence and proximate cause are not ordinarily questions which may be taken from the jury. "They become questions of law only when the state of the record is such that reasonable men can draw but one conclusion therefrom". Froh v. Hein, 76 N.D. 701, 39 N.W.2d 11, 13; Geier v. Tjaden, N.D., 74 N.W.2d 361, 364.

■ Negligence and proximate cause will become transformed from

questions of fact into questions of law rather on probative deficiency than on probative abundance. Thus, no matter how strong the evidence of a party, who has the burden of establishing negligence and proximate cause as facts, may comparatively seem to be, he is not entitled to have those facts declared to have reality as a matter of law, unless there is utterly no rational basis in the situation, testimonially, circumstantially, or inferentially, for a jury to believe otherwise. Nor is a court required to set aside a verdict in such a situation, just because the judgment of the jury may have been strange and unusual on the evidence in the case.

The most, therefore, that can be said of the result in the present situation is, as we expressed it in Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 444, that, "if the verdicts are erroneous, the error was an error of fact committed by the jury and not an error of law committed by the court".

Appellants' other contentions, all of which relate to requests for instructions, are without substantiality as against the charge in its whole, which the court gave, and so do not call for discussion.

Affirmed.